Ken M. DAVEE and Adeline B. Davee

v.

The UNITED STATES.

Elizabeth Kline JORDAN and Lea Associates, Inc.

v.

The UNITED STATES.

Nos. 242–66, 433–66.

United States Court of Claims.

June 11, 1971.

Morris J. Coff, Chicago, Ill., attorney of record, for Ken M. Davee and Adeline B. Davee, David D. Rosenstein, Fink, Coff & Nudelman, Chicago, Ill., of counsel.

Andrew B. Young, Philadelphia, Pa., for Elizabeth Kline Jordan and Lea Associates, Inc., Robert C. Lea, Jr., Philadelphia, Pa., attorney of record, Hart, Childs, Hepburn, Ross & Putnam, Philadelphia, Pa., of counsel.

W. Stephen McConnell, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for the United States. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

**PER CURIAM:**

This case was referred to Trial Commissioner C. Murray Bernhardt with directions to make findings of fact and recommendations for conclusions of law under the order of reference and Rule 134 (h). The commissioner has done so in an opinion and report filed on July 28, 1970. Exceptions to the commissioner's opinion, findings of fact and recommended conclusions of law were filed by plaintiffs in No. 433–66 and defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, with the deletion of matter in the opinion no longer pertinent to the case, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set forth. Therefore, plaintiffs in No. 242–66 are entitled to recover and judgment is entered for them with the amount of recovery to be determined pursuant to Rule 131(c). Defendant is entitled to recover on its counterclaim in No. 433–66, however, the entry of judgment thereon is deferred pending determination of plaintiffs' case in chief in that litigation.

Commissioner Bernhardt's opinion, with the deletion of matter no longer pertinent, is as follows:

The common primary issue in these two companion petitions concerns the tax treatment to be accorded the consideration in the sale of a going business by plaintiff Davee (hereafter denoting husband and wife coplaintiffs) in the one petition to plaintiff Lea in the other petition,[1] particularly wherein a portion was specifically allocated by agreement of the parties to a covenant not to compete. The stakeholding Government, which originally opposed the taxpayers' conflicting contentions on mutually inconsistent grounds, now opts for the Davee view that the sale of all but the covenant not to compete was a capital transaction and taxable as such, and opposes Lea's position that the entire sale resulted in ordinary income to Davee and amortizable deductions to Lea because (per Lea) the dominant if not sole asset bought by Lea and sold by Davee was the later's covenant. A secondary issue affecting only the Davee petition is the tax treatment for payments he made to a French concern for assembling data to launch a new market research business serving the French market.

### I—Covenant Not To Compete Issue

Essentially we have two concerns (Lea and Davee) which, in 1962, were sole competitors in providing a particular market research service to large American pharmaceutical and ethical drug manufacturers in the form of periodical publications which, based upon continuous surveys compiled from nationwide panels of representative physicians reported to their respective customers the fluctuating professional response to, and the use and effectiveness of, various drugs, presumably as a basis for determining trends which would dictate future research, manufacturing and sales efforts. While each of the competing services duplicated the other's principal purpose, gathered its statistical data in comparable ways through an elaborate and expensive network of assistants in the healing profession such as doctors and interns, and computerized the myriad data thus obtained in coded form for customer consumption, each service had its own stable of customers and varied somewhat as to contents, format, and title. Thus Lea's publication was known as "National Drug and Therapeutic Index" (NDTI) and Davee's was "Physicians' Panel".

By 1962 it became apparent that the number of potential customers in the drug and pharmaceutical industry was not sufficient to support comfortably

---

[1]. Elizabeth Kline Jordan and Lea Associates, Inc., are coplaintiffs in Petition No. 433–66. Jordan is a stockholder of her coplaintiff corporation. Plaintiffs in No. 433–66 will be referred to as "Lea" for convenience.

both NDTI and Physicians' Panel. Of the limited number of customers for this expensive service ($28,000 per year) Davee then had 18 and Lea, which had fewer, was gradually nibbling away at Davee's roster of customers. Physicians' Panel was only one of several profitable marketing services in generically related fields owned and conducted by Davee.

In 1962 Lea made overtures to purchase Davee's Physicians' Panel. The record of these negotiations over a period of several months, as reported in annexed findings 15 through 22, contains offers by Lea, counteroffers by Davee, and a series of amendments, deletions, additions, etc., culminating in two companion documents—a sale agreement of May 31, 1962 and a letter agreement of June 1, 1962. Throughout negotiations the parties had consulted with their respective tax counsel as to the tax ramifications of the transaction, and it cannot be said that either was unaware of what he was doing. Nor is there a hint of fraud, duress or mistake, or even misunderstanding, in the final arrangements they perfected or in the negotiations preceding them. These were sophisticated and informed businessmen who fully understood the legal effect of their undertaking, particularly as to resulting taxes, and without doubt the agreement was reached on the basis of prospective profits and earnings after taxes.

The sale agreement described Davee's Physicians' Panel (section 1), referred to Lea's wish to expand the NDTI service by "purchasing" Physicians' Panel (section 2), mentioned Davee's agreement to "sell" and Lea's agreement to "buy" Physicians' Panel (section 3), permitted Davee to continue to operate his other marketing research services but prohibited him for five years from soliciting or obtaining any data from physicians in the United States with specific exceptions not here germane (section 4), stipulated a purchase price of $320,000 payable in cash and installments over five years (section 5), prohibited Davee from collecting any further data for Physicians' Panel and required him to furnish Lea his past reports, casebooks, and other material concerning operation of Physicians' Panel within prescribed times so that Lea could "utilize these data and materials in the operation of its NDTI service and the business sold hereunder" (section 6), provided a $37,500 bonus to Davee for consummating the deal by July 6 or $18,750 by October 5, 1962 (section 7), provided forfeiture to Davee of both the Physicians' Panel and NDTI on Lea's default of the purchase notes (section 8) and, reciprocally, a cancellation of the notes and a return to Lea of all amounts paid Davee thereunder upon default by Davee of his obligations under the contract (section 9), assumption by Lea of Davee's obligations (nil) to his Physicians' Panel subscribers (section 11), and a commission to Davee if Physicians' Panel subscribers switched to NDTI prior to the consummation date (section 12). Repeated references in the sale agreement to the fact of purchase and sale leave no room for doubt that, at least in form, the parties contemplated the sale of a going business. It is worthy of note that the *sale* agreement did not allocate any portion of the purchase price to a covenant not to compete, nor contain any allocation to the covenant of Davee in section 4 not to solicit or obtain reports or data from physicians in the United States, nor did it mention goodwill by name.

The letter agreement of June 1, 1962, which was executed contemporaneously with the sale agreement, provided for the payment of compensation of $6,000 per year for five years for the consulting services of Davee and his wife. It also contained a payment in the event of death provision, and the following covenant not to compete which is at the heart of this litigation:

It is also understood that during the five years following the consummation date, neither of you [*i.e.*, neither Davee nor his wife] will engage directly or indirectly as owner, manager, operator or associate or in any other capacity in the operation or control of any panel based on data obtained from

physicians within the United States of America, nor will anyone employed by you engage in the operation or control of such a panel in the course of such employment. * * *

There is no particular significance to be derived from the fact of two separate but contemporaneous instruments, a sale agreement and a letter agreement. Whatever result they achieved by the separation could have been equally accomplished by a merger of the two documents into one. Merged or not, the separate allocation in the letter agreement to a covenant not to compete could be deemed to subsume the non-competition language in section 4 of the sale agreement. Further, the record reflects that, despite the literal wording, the $30,000 consideration for the letter agreement was almost exclusively for the covenant not to compete expressed therein. The consulting services proffered by Davee and his wife, and the payment-in-the-event-of-death provision, were only of fringe significance and value, and why they were included in the letter agreement along with the covenant is not quite clear.

The covenant not to compete underwent several metamorphoses in the course of negotiations before assuming its final form. In the initial draft of an agreement prepared by Lea a five-years' covenant not to compete was included, to which Lea proposed allocating three-sevenths of the contract price. Lea did not want to include goodwill in the description of assets proposed to be transferred because goodwill could not be depreciated for tax purposes. Davee rejected the proposed allocation to the covenant and could not think of a basis for allocating a portion of the contract price for that purpose; moreover, he had been advised by counsel that such a covenant would be illegal. Davee submitted a revised draft to Lea which contained a covenant not to compete, but no price allocation was given to it. Lea countered with a draft which included a three-years' covenant not to compete without allocation of purchase price, and

expressed concern that the tax authorities would assign a value to the covenant if the parties did not do so themselves. Davee then responded with a revised draft of the sale agreement omitting the three-years' covenant not to compete but incorporating it in a separate letter agreement along with a provision for the part-time consulting services of himself and his wife for three years. The parties never contemplated that Davee and wife would actually render any substantial services as consultants to Lea, and the services rendered later were minimal. The letter agreement proposed a payment of $30,000 by Lea for the promises it included, and the $350,000 sale agreement consideration was correspondingly reduced to $320,000. The parties then entered into the sale agreement and letter agreement previously described, which followed the final drafts except for increasing the three-years' covenant not to compete and the consulting services provision to five years instead of three, and altered the installment payments for the letter agreement to $6,000 per year for five years. The parties fully understood and intended that the $30,000 consideration for the covenant was to be treated as ordinary income to Davee and a deductible expense to Lea.

Thereafter Davee earned the $37,500 bonus for early consummation offered by Lea by canceling the subscriptions to Physicians' Panel promptly and turning over to Lea the office records and data. The chief value of the data to Lea was in effectively discouraging Davee from re-entering the field by depriving him of his data. Lea unilaterally assigned a subjective value of $75,000 to the data several months following the sale, and had little practical use of it other than as stated. Lea did not use any individuals on Davee's list of interns and physicians who had contributed to the information in Physicians' Panel. No customer contracts, nor the names of Physicans' Panel and Davee, were transferred with the sale. Lea's principal purpose in the purchase was the expectancy that, with Davee eliminated, the customers of

Physicians' Panel would become NDTI customers. On the other hand, Davee considered that he had sold a going business. Davee's books were not audited by Lea to ascertain net income figures, no receivables were transferred, and assumed liabilities were nonexistent.

Income tax returns filed by Davee for 1962 and 1963 reported payments received from Lea under the sale agreement as capital gains on an installment basis, and those received under the letter agreement as ordinary income. The District Director of Internal Revenue assessed deficiencies on the ground that all of the amounts received from the sale of Physicians' Panel were ordinary income. Davee paid the deficiencies and more than six months have elapsed from the date of his refund claims, without a decision having been rendered. The deficiencies paid and the refund claims therefor include amounts for both the primary issue and a secondary issue to be discussed, *infra*.

Having deducted for tax purposes the payments made to Davee in 1962 under the sale and letter agreements, Lea consented to deficiency assessments made by the Internal Revenue Service which were based on the contention that the payments made as described were improperly deducted since the purchase of Davee's business was a capital transaction. In response to Lea's suit herein for refund of assessments which had been made and paid for an unrelated earlier transaction, the defendant filed a counterclaim for the unpaid assessments arising from the Davee purchase. The initial ambivalence of the Government in its opposition to both the Lea and Davee contentions is apparent, and rested on the standard burden of proof obligation which taxpayers bear in refund suits, but it was cured ultimately by the Government's announced preference for the Davee contentions.

■ To put the legal problem in perspective: The sale of a going business gives rise to capital gain or loss since it is the sale of a capital asset. When a properly qualified covenant not to compete for a specified period is entered into as part of the sale of a going business under particular conditions, the portion of the consideration attributable to the covenant is normally taxable as ordinary income to the seller, and the purchaser may deduct the cost over the period of the covenant's ascertainable life. This is so because the consideration is for services, albeit in the negative form of forbearance from future competitive conduct. A sale entailing goodwill results in capital gain to the seller, but the buyer may not depreciate the goodwill because it is an intangible asset whose useful life is not susceptible of determination. All excess of the sale price over the value of the tangible assets transferred should be assigned to the covenant not to compete and other intangibles, the latter habitually being goodwill or its equivalent. It is conceivable, but rare, that a "naked" covenant not to compete (*i. e.*, one unaccompanied by the sale of the assets of the related business) can be given in the total absence of goodwill.

■■ The rule of law deemed to govern the facts of this case is as follows: If the parties to the sale of a going business comprising tangible and intangible assets, including goodwill, or its equivalent, bargain in good faith at arms' length, and without mistake, fraud, or duress, over the allocation of a specific part of the purchase price to the seller's covenant not to compete,[2] and both the covenant and the value allocated to it

---

2. There have been times when the court has disregarded the good faith agreement of the parties with respect to allocation of part of the purchase price of a business between goodwill and a covenant not to compete, and has substituted an allocation of its own (Levine v. C.I.R., 324 F.2d 298 (3rd Cir. 1963), aff'g 31 P–H Tax Ct.Mem. 410 (1962)), and other times when in the absence of a separate allocation by the parties the court has supplied one (Horton v. C.I.R., 13 T.C. 143 (1949), appeal dismissed on Commr.'s motion, 180 F.2d 354 (10th Cir. 1950)), and Melvin C. Miller, 33 P–H Tax Ct. Mem. 2079 (1964).

possess economic reality independent of tax advantage as prime motivation in that the seller surrenders a right which he is capable of exercising for a price which is realistic and reasonable in the circumstances of the particular transaction, then the value so allocated to the covenant is taxable as ordinary income to the seller and is deductible by the buyer, even though the purpose of the covenant is to effectuate and protect the passage of pseudo goodwill of which it is an ancillary and inseparable component. The balance of the sale is then treated as a capital transaction. This is the conclusion compelled by the weight of the case law and necessary to provide the taxpaying business community with a stable and predictable basis for the tax consequences of their contemplated transactions. In passing it is only fair to comment that while the solution is practical it is syllogistically imperfect in that it accepts the severability of goodwill from a covenant not to compete solely because of the manner in which the latter is arrived at and the form in which it is couched, whereas except in the case of the sale of a naked covenant, it is difficult to conjure an effective transfer of goodwill which permits the seller to frustrate it by continuing to compete for the trade of his former customers.[3] In fact, the sale of goodwill carries with it by implication alone the seller's refrainment from competition since his competition after the sale may constitute a breach of the agreement to transfer goodwill. In contract law such a covenant is enforceable only if given to protect the conveyance of goodwill.[4]

No rules of unerring application derive from the considerable body of litigation concerning the taxation of the consideration given and received for covenants not to compete in connection with the transfer of goodwill incident to the sale of a business. Legal thought divides into three general approaches employing the doctrines of severability,[5] substance over form,[6] and form over substance,[7] each of which schools has its supporting judicial precedents and scholarly adherents and dissidents.[8] The facts of the given case governing the result do not necessarily conform to the models representing each school, and offer a basis for frequent departure. The intentions of the parties as evidenced in their agreements, the form in which those intentions are expressed, the legitimate desire of taxpayers for a coherent and foreseeable tax consequence, the Government's insatiable thirst for revenue, the antithetical interests of buyer and seller, and the economic realities of each transaction combine to shape what is in the final analysis a subjective expression of the sitting court's predilection and philosophy.

3. Mertens, Law of Federal Income Taxation, postulates in § 22.33 at p. 219 the inherent difficulty of envisaging a covenant not to compete which is severable from the goodwill which it is essentially designed to protect. *And see* Schulz v. C.I.R., 294 F.2d 52 (9th Cir. 1961), aff'g 34 T.C. 235 (1960), which regarded such covenant as necessarily a contribution to goodwill. *But* Wilson Athletic Goods Mfg. Co. v. C.I.R., 23 P–H Tax Ct.Mem. 845 (1954), rev'd and rem'd, 222 F.2d 355 (7th Cir. 1955), comes close to being an example of a case where a covenant not to compete was not tied into goodwill since the purchaser had no visible use for the seller's goodwill in the form of the seller's name, customers, etc. In the case under consideration Lea had little or no use for Davee's goodwill as such in the conventional sense.

4. Madison, Tax Treatment of Covenants Not To Compete, 24 U.Miami L.Rev. 1 (Fall 1969), n. 4, at pp. 18, 19.

5. Ullman v. C.I.R., 29 T.C. 129 (1957), aff'd, 264 F.2d 305 (2d Cir. 1959). *But see* Toledo Newspaper Co., 2 T.C. 794 (1943) and Toledo Blade Co. v. C.I.R., 11 T.C. 1079 (1948), aff'd 180 F.2d 357 (6th Cir. 1950), cert. denied, 340 U.S. 811, 71 S.Ct. 38, 95 L.Ed. 596, (1950).

6. Wilson Athletic Goods Mfg. Co. v. C.I.R., n. 3, *supra.* Annabelle Candy Co. v. C.I.R., 314 F.2d 1 (9th Cir. 1962).

7. Danielson v. C.I.R., 44 T.C. 549 (1965), vacated and rem'd, 378 F.2d 771 (3d Cir. 1967), cert. denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967).

8. Madison, *supra*, n. 4.

■ The legal conclusion announced as being applicable to the instant situation rests upon considerations peculiar to its set of facts. Each of the parties was, or should have been, fully cognizant of the probable tax results of their deal, and are therefore presumed to have intended them. Each party was a free agent, neither mistaken nor coerced. Section 9 of the sale agreement conditioned payment of Lea's installment purchase notes on Davee's refraining from soliciting or obtaining data from physicians in violation of section 6.[9] The antithetical positions of the parties as buyer and seller tend to produce a roughly countervailing effect on tax revenues, in that the loss in tax revenue from the seller is approximately met by the gain in revenue from the buyer. At least the Government has not said otherwise, but instead has adopted in its brief the following *laissez-faire* position favorable to Davee:

> The Government takes the view that where the parties to a transaction involving the sale of a business have entered into a separate written agreement spelling out the precise amount to be paid for a covenant not to compete, the Court should not then go behind the agreement at the insistence of either party unless there is shown fraud, duress, or undue influence such as would be necessary to alter the terms of the contract itself. Commissioner [of Internal Revenue] v. Danielson, 378 F.2d 771 (C.A.3d, 1967). This is the rule we urge in these cases.

The agreement of the parties on the covenant not to compete had economic reality, in that Davee, the covenantor, surrendered a valuable right to compete, when he was fully capable of competing for the indefinite future. The court is in a less favorable position than the parties to judge the economic reality of the value assigned by them to the covenant.

Undoubtedly, the amount was agreed upon by the parties with the tax impact in mind. Where they do so it is rarely the province of the court to revise their agreement in the absence of a shocking disproportion or manifest injustice to the public treasury, in which case the Government would be expected to remark it.[10]

Lea's position urging that the entire purchase price should be allocated to the covenant not to compete is extreme. It is based upon the fact that Lea genuinely had little or no use for Davee's services or his back records, except to deprive Davee of the latter as a further impediment to his competitive reentry, on top of other sanctions imposed by the agreements. Lea's argument to this end not only repudiates the terms of the written agreements and the record of negotiations leading thereto,[11] but also would expose the transaction to a speculative risk of restraint-of-trade invalidity from the viewpoint of public policy. If so, Lea's right to claim tax deductions by virtue of an agreement which is in violation of public policy would be in possible jeopardy.[12]

Furthermore, Lea's position if adopted would in effect amount to a rewriting of the contract between the parties so that it would produce a net financial result contrary to their clear intentions. It would, for example, be unrealistic to expect that Davee would have been interested in selling to Lea for a net-after-tax figure of approximately $100,000 a going—though dwindling—business which netted him about $90,000 per year, yet this would be the estimated consequence to Davee were Lea's argument to prevail. It is natural to assume that the sale appealed to Davee because his income from other sources reduced his net-after-tax income from Physicians' Panel to a figure not sufficiently attractive to justify its continuation in comparison to

---

9. *Cf.* Carboloy Co., 2 T.C. 1267 (1943).

10. Levine v. C.I.R., *supra*, n. 2.

11. There is authority that such unilateral repudiation in order to obtain favorable tax treatment may constitute a breach of contract. Stern & Co. v. State Loan & Fin. Corp., 205 F.Supp. 702, 705–706 (D.Del.1962).

12. *Cf.* Hardin Mort. Loan Co. v. C.I.R., 137 F.2d 282 (10th Cir. 1943).

his retained after-tax capital gain resulting from the sale. On the other hand, it is equally obvious that the prospective revenues from Davee's former customers for the Physicians' Panel service which Lea hoped to acquire for NDTI involved little more expense for Lea than Lea's expenses of servicing its existing customers for NDTI. While it would be to Lea's financial advantage to be permitted to deduct from gross income all payments made for the purchase of Physicians' Panel, precluding that annual privilege could eventually result in beneficial long-term capital gain treatment to Lea by increasing the cost basis of an NDTI business swollen by the acquisition of Physicians' Panel customers.

Other than the covenant not to compete, the nature of the intangible asset sold by Davee to Lea defies precise characterization. For transparent reasons Lea considers the entire consideration for the purchase price to have been the covenant. Davee terms the non-covenant intangible thus transferred to be something in the nature of goodwill. The Government more aptly styles it "market access" and points out that, to the extent Lea was able to acquire Davee's former customers, Davee's covenant not to compete for five years conferred for practical purposes "market access" or "goodwill" of a more or less permanent nature, or so long as Lea provided services desired by NDTI customers. This is on the theory that a five-year absence by Davee would effectively deter his resumption of competition with NDTI, particularly in view of his deprivation of prior records. The fact that in the pre-contract negotiations Lea refused to purchase goodwill, and that no reference to goodwill is made in the agreements themselves, merely reflects Lea's awareness that goodwill is not a depreciable asset, rather than establishing the intangible sold to be something other than a species of goodwill in substance. In contending that the sale constituted in substance a sale of Davee's covenant not to compete, Lea relies heavily on section 4 of the sale agreement which prohibited Davee for five years from soliciting or obtaining any data from physicians in the United States. Contrasting this provision with the related covenant contained in the letter agreement discloses the inadequacy of section 4 of the sale agreement as a fully restrictive covenant by Davee not to compete. For example, strictly interpreted as such covenants must be, it would not have prevented Davee from obtaining and using such data indirectly through the medium of an agent or his wife. Lea also argues that the deliberate non-transfer of the names of Davee and Physicians' Panel in connection with the sale indicates that no goodwill was involved in the sale. The explanation is that Lea had no use for the title of Physicians' Panel nor for Davee's name and services, although the services of Davee and his wife were nominally included in the letter agreement without any intention on the part of Lea to use them in any substantial degree. Davee's blessing in the form of his disappearance rather than his active help was Lea's sole object.

In this case the court can justifiably disregard the personal motives of Lea in purchasing Davee's business since, even if true, to the extent Lea's motives differ from the contract terms of what was done the latter will control. Thus, if Lea's prime purpose in the transaction was to eliminate Davee's competition, in purchasing Davee's business rather than solely a covenant not to compete Lea exercised a choice of forms which involved the purchase of something over and above Davee's naked covenant. Whatever that something was, particularly as to intangibles, clearly meant to Davee the surrender of his business, with the covenant as a separate but ancillary benefit conferred on the purchaser. Even if Lea's contention is correct that the substance of the entire sale was of a covenant not to compete to the virtual exclusion of anything else of value and contemplated use, in weighing the respective merits of preserving the legal theory or recognizing the equitable consequences of not doing so, the practical aspects of the latter will dictate the decision.

## II—*"Pharmacies-France" Issue*

In 1962 Davee commenced a new marketing research business consisting of the periodic publication of a report entitled "Pharmacies-France" containing detailed statistical information on the ethical drugs sold in France. The report was based upon data furnished by a cooperating group of French drugstore owners and operators. In 1962 Davee paid a French management consulting firm $12,257.50 for its services in obtaining sources of data for "Pharmacies-France", and in 1963 $2,353.55 was paid to the same firm for similar services. Not only for the French Panel, but for all reports published by Davee, it was always necessary to recruit people who would cooperate in furnishing data. Constantly, certain sources of data were no longer willing or able to supply data, and these sources had to be replaced by others.

The particular services for which Davee paid the French firm were for enlisting the cooperation of some 400 French pharmacies, securing replacements as needed, reimbursement for payments to the cooperating sources, and monthly visits to microfilm records.

On their Federal income tax returns for 1962 and 1963, the plaintiffs deducted these amounts paid to the French firm as ordinary and necessary business expenses. The District Director of Internal Revenue, adopting a Revenue Agent's report for the years in question, determined that such amounts were—

\* \* \* [Expenditures] \* \* \* associated with the start-up of Marketing Research for the collection of data in France.

This expenditure incurred by the taxpayer represents a capital expenditure that is not subject to depreciation due to its indefinite life.

Accordingly, the deductions were disallowed. Deficiencies were assessed and paid. Refund claims timely filed by plaintiff have not been decided despite the passage of more than six months, and timely suit was instituted as a count in the instant petition.

Davee contends that the costs in issue were deductible in full as ordinary and necessary business expenses within the meaning of section 162 of the Internal Revenue Code of 1954, as recurring expenses, while the Government contends that the expenses were in connection with permanent improvements and benefits made to increase the value of the property, whose deduction is forbidden by section 263(a) (1) of the 1954 Code.

The Government's contention is based largely upon the disproportion between the 1962 expenses ($12,257.50) and those for 1963 ($2,353.55), inferring a lack of the recurrency required to support Davee's position. The disproportion suggests that only an allocable portion of such expenses were recurrent in fact, namely, those attributable to replacement, payment, and regular servicing of drugstore contributors, as opposed to the initial enlistment of a roster of such trade contracts. The burden of proving the allocation is, of course, on the taxpayer.

■ To extricate himself from the effect of section 263(a) (1), *supra,* Davee cites section 173 of the Code which exempts from section 263 all expenditures to "establish, maintain, or increase the circulation of a newspaper, magazine, or other periodical", with exceptions not here relevant. Assuming Davee's French service to be a periodical, section 173 is specifically addressed to *circulation* expenses and not to the expense of establishing the periodical itself. The contributing drugstores constituting the source nucleus of the French service cannot be remotely equated to the subscribers to a publication. Subscribers are customers of a publication. Davee's potential "subscribers" were French pharmaceutical concerns, not the contributing drugstores.

■ Analogically there is the same approximate relationship between a news reporting staff and its newspaper employer on the one hand and Davee's drug-

store network and his publication on the other. In each case the publication obtains its raw data from these sources, and without such data the newspaper could no more obtain subscribers than could Davee's service obtain customers. Thus, there is in each instance a remote relationship of the data-gathering function to the "circulation" structure of each publication, but the circulation expenses contemplated by section 173 of the Code demand something more proximately related to circulation, such as expenses of advertising, solicitation, distribution and the like aimed at establishing, maintaining, or increasing the circulation.

The theory of capital expenditures is described by Mertens, Law of Federal Income Taxation, at § 25.20, pp. 96–98, as follows:

> Section 162 of the 1954 Code is intended primarily, although not necessarily, to cover expenditures of a recurring nature where the benefit derived from the payment is realized and exhausted within the taxable year. Accordingly, if as the result of the expenditure the taxpayer acquires an asset which has an economically useful life beyond the taxable year, or if it secures a like advantage to the taxpayer which has a life of more than one year, no deduction of such payment is allowable as a business expense. In such event, to the extent that a deduction is allowable, it must be obtained under the provisions of the Code which permit deductions for amortization, depreciation, depletion, or loss. * * *.

And at p. 102 of § 25.20 Mertens continues:

> Occasionally, an expenditure may represent in part a business expense and in part a non-business expense, which latter might or might not be a capital expenditure. In such cases it is necessary to make an allocation so as to determine the amount deductible under this provision of the statute. The burden of proving the proper allocation of the total payment is on the taxpayer.

[Footnotes omitted.]

The issue in each case is necessarily a factual one. It is reasonable to conclude in this case that the expenditures made by Davee in 1962 were largely non-recurrent and, therefore, non-deductible, and those made in 1963 were recurrent and deductible. While the plaintiff has the burden of proving the proper allocation, it is permissible to satisfy that burden by producing facts from which logical inferences can be drawn where by the nature of the issue literal proof would be inordinately difficult and out of proportion to the aim. Thus, in this instance, it is inferred that the 1962 expenditures were starting-up expenses associated with the establishment of a new venture in a limited marketing service field, and that the results of the expenditure that first year were primarily to establish a fluctuatingly permanent data basis for a publication good not only for that year but, with additions and deletions, for subsequent years. It is assumed that the major part of the 1962 expense represented the enlistment of the drugstore panel. This is corroborated by the vastly greater expense in 1962 than in 1963, and the excess is properly attributable in great part to the enlistment of cooperating drugstores. To the extent that a portion of such total expense in 1962 was for securing replacements as needed, or for reimbursement of expenses paid to the cooperating sources, or for monthly visits to microfilm records—all of which type of expenses would be, if proven, currently deductible as ordinary and necessary—the plaintiff has not undertaken an allocation and the court is not in a position to do so without rank guessing.

For consistent reasons all of the expense deducted in 1963 is considered to be ordinary and necessary in character, and therefore deductible, consisting as it undoubtedly did in largest part in rendering required services other than occasional recruitment of replacement drugstores.

The importance of this resolution of the issue to Davee is that if the expenses

in question are not deductible as ordinary and necessary business expenses, they would not qualify for amortization deductions otherwise because the benefits they confer on the business lack a reasonably ascertainable useful life for spreading purposes. Thus, Davee would be permanently deprived of the benefit of using such costs in his annual tax equation, and would be left only with an increased cost basis when and if he eventually disposes of the business as a capital transaction.

It is believed that this solution is compatible with a 1921 ruling of the Commissioner in O.D. 1018, 5 Cum.Bull. 119, relative to the deductibility of amounts paid for data regularly used in a business supplying information to customers on a regular basis. There the problem concerned title abstract companies which must constantly obtain necessary data in order to conduct their business. The Commissioner stated:

> Title abstract companies incur relatively large and continuous expenditures in keeping their plants up to date, such as the expense of adding and incorporating in the plant records that are being made daily in the various courts and in the Recorder's office.

> These records which are added to and incorporated in the plant for the purpose of keeping it in up to date running order and preventing depreciation are in the nature of ordinary and necessary repairs. The expenses, therefore, incurred in making such records are current expenses, and as such are deductible for the year in which incurred and paid or accrued.

\*    \*    \*    \*    \*    \*

The plaintiffs in Petition No. 242–66 are entitled to a judgment in accordance with this opinion and judgment should be entered for plaintiffs, with the amount to be determined pursuant to Rule 131(c). The defendant is entitled to judgment on its counterclaim in Petition No. 433–66; however, the entry thereof should be deferred pending determination of the plaintiffs' case in chief in that litigation.