Robert E. DAKAN and Cecelia Dakan
v.
The UNITED STATES.
No. 12–69.

United States Court of Claims.
Feb. 20, 1974.

Paul E. Anderson, San Francisco, Cal., attorney of record for plaintiff. C. Henry Veit, San Francisco, Cal., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant. Gilbert E. Andrews, Jr., Washington, D. C., and Roger A. Schwarz, Washington, D. C., of counsel.

Before DAVIS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to former Trial Judge William E. Day, with directions to make findings of fact and recommendations for conclusion of law under the order of reference and Rule 134(h). The trial judge has done so in an opinion and report filed November 9, 1972. All of the exceptions to the trial judge's opinion, findings of fact and recommended conclusion of law were filed by the plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties.

The issue to be decided is the plaintiff's claim for capital gain treatment for portions of the proceeds of a sale by him of a mortgage loan correspondent business. Before us, plaintiff conceded that a portion of the $200,000 sale price, designated by him as "The right to service loans: $54,943.80" must receive ordinary income treatment. However, citing Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929 (5th Cir. 1963), he claims capital gains treatment for elements of the "bundle of rights" he sold, designated by him as:

Files and Records ..................... $36,600
Bank lines of credit resulting from monthly
   escrow deposits ..................... $10,000
The right to originate loans ............. $60,000

Defendant does not deny capital gains treatment for $26,555.65, good will, and for certain other smaller items, one of which was "Furniture, furnishings, and equipment," $9,900.55, as described in the sales agreement. However, defendant says, and we agree, that the contract goodwill item included by its terms "the goodwill attributable to the above described assets", i. e., to the seller's contracts with various insurance companies, and thus included the value of profit expectations, other than the right to service existing loans, incident to future business under those contracts, i. e., bank lines of credit and the right to originate loans. Moreover, defendant says, the "Furniture, furnishings, and equipment," item included by its terms the files and records. Thus plaintiff would add an aggregate of $106,600 to the value allocated in the agreement of sale to two capital items, correspondingly reducing the non-capital items. His argument before us that he could make the allocation he contends for without inconsistency with the sales agreement is therefore shown to be untenable, and must be rejected.

The trial judge holds that in the absence of mistake, fraud, undue influence, etc., the taxpayer is bound by the allocations he made in the sales agreement, citing Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), cert. denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). We have twice recently cited Danielson with approval. Davee v. United States, 444 F.2d 557, 195 Ct.Cl. 184 (1971); Eckstein v. United States, 452 F.2d 1036, 196 Ct.Cl. 644 (1971). Danielson involved an allocation in a selling agreement between stock and a covenant not to compete, and it was held or assumed that the assignment of any value to the covenant not to compete was not in accord with economic reality. It was also held or assumed that a polarity in the tax treatment of buyer and seller was required, i. e., one had to be a counterpart of the other. Thus to sustain the seller's position would jeopardize the buyer's enjoyment of the tax treatment it presumably had bargained and paid for.

Defendant considers there is a similar polarity here, and its counsel stated before us that the pertinent tax year of

the buyer, Commonwealth, is still open and will be disposed of in harmony with our decision to be made concerning the seller. Plaintiff, however, says there is no polarity and that the buyer is not necessarily precluded from amortizing an item in the "bundle of rights" solely because the seller obtains capital gains treatment for it.

The question is not free from difficulty but we do not think the outcome of the case depends on the answer. Let us assume *arguendo* there is no polarity and that plaintiff is therefore not "estopped" to take a position here adverse to the buyer's interests. The fact remains, in this case, unlike *Danielson*, the trier of fact made no finding that the contract allocation lacked economic reality, and no exception is taken to the omission. As said in *Davee, supra*, 444 F.2d at 564, 195 Ct.Cl. at 196, the court is in a less favorable position than parties bargaining at arm's length to determine the values of the various rights involved, and it will not revise their agreement in the absence of a shocking disproportion or manifest injustice to the public treasury. As we read *Danielson*, it was the finding of lack of economic reality in the allocation of value to the covenant not to compete, that brought forward considerations of estoppel and unfairness to the buyer. Here, if Commonwealth's interests are not considered, the bargained agreement of sale still fixes the kind and value of the rights transferred and the Internal Revenue Service is within its rights in following the agreement, not an ex post facto allocation that repudiates the agreement. The *Bisbee-Baldwin* case involved a sale without any contract allocation and it is not authority for repudiating an allocation when a contract of sale makes one.

Plaintiff says he relied on Nelson Weaver Realty Co. v. Commissioner, 307 F.2d 897 (5th Cir. 1962), which held that all proceeds of a sale of a mortgage loan correspondent business were capital gains. He believed he could disregard an express contract allocation, and that his position would not be at polarity with the buyer's. *Danielson* was not yet on the books. *Bisbee-Baldwin* in effect overrules *Nelson Weaver Realty Co.*, insofar as the former holds that in the absence of contract allocation the tax consequences of such a sale must be determined separately as to each one of the "bundle of rights" transferred. It may be said the degree of reliance on *Nelson Weaver Realty Co.*, is surprising in view of the fact it was decided in a circuit other than the one plaintiff lived in, by a divided panel and with a vigorous dissent by the distinguished Chief Judge. Failure to evaluate correctly the tax consequences of a sale is not the kind of mistake that might allow the court to reform the contract for tax purposes. *See*, Hamlin's Trust v. Commissioner, 209 F.2d 761 (10th Cir. 1954).

Since the court is in agreement with the opinion, findings of fact and recommended conclusion of the trial judge it hereby adopts the same, as modified and supplemented by the preceding, as the basis for its judgment in this case. Accordingly, the petition is dismissed.

The opinion, findings of fact and conclusion of law of the trial judge [*] follow:

The plaintiff, Robert Dakan, sold his mortgage loan correspondent business to Commonwealth, Inc., in 1962 and is now before this court contesting the Internal Revenue Service's treatment of that sale. Plaintiffs [1] sue for a refund of $47,896.-85, plus interest accruing from 1962 to 1964, paid when the Commissioner of Internal Revenue determined that $161,543.80 of the $200,000 received from the sale of the business did not qualify for capital gains treatment and consequently had to be taxed as ordinary income. Defendant denies the substance

---

[*] The opinion, findings of fact, and recommended conclusion of law are submitted pursuant to Rule 134(h).

[1] Cecelia Dakan is joined as a plaintiff because joint returns were filed with her husband.

of plaintiff's contentions and urges that this court apply the rule that parties to a sale of a mortgage loan correspondent business be bound to the tax consequences of their agreement so as to insure the integrity of their bargain and provide for effective, predictable administration of the tax laws.

Robert Dakan operated a mortgage loan correspondent business in the San Jose, California, area as a sole proprietorship. The mortgage loan correspondent business consisted of agreements which Dakan had with three insurance companies [2] whereby the insurance companies agreed to take over mortgage loans solicited by Dakan and Dakan agreed to offer such loans to the insurance companies and, in most cases, to perform the necessary servicing functions required by the companies after the loans had been taken over. As compensation Dakan received interest commissions each month amounting to $\frac{1}{24}$ or $\frac{1}{48}$ of 1 percent of the outstanding balance of loans placed by Dakan with the particular insurance companies.[3]

Though Dakan was entitled to commissions, he retained no ownership interest in the loans. By terms of the agreements with the insurance companies, Dakan had a general claim for commissions against each insurance company but did not have a specific lien on the loan payments due each company. The three insurance companies possessed the right, upon written notice, to terminate at will their correspondent agreements with Dakan. In addition, the agreements could not be assigned without the companies' consent.

Dakan entered into a preliminary agreement with Commonwealth on April 30, 1962. By terms of this agreement, Dakan received an interest-free loan of $100,000 from Commonwealth and agreed to solicit and develop loans for Commonwealth in the San Jose area for the next 18 months. During this period, Commonwealth had a right of first refusal on all loans developed by Dakan. Commonwealth's practice was to offer loans accepted by it to other lenders, including Penn and Standard, and claim all applicable servicing fees paid by these companies. At the same time, Dakan was allowed to continue to place loans with Northwestern in amounts commensurate with his previous loan placement practice and to retain all placement fees paid by borrowers, regardless of by whom these loans were taken over.

Dakan assigned all rights in his contracts with Penn and Standard to Commonwealth as security for the $100,000 loan. Fees earned for servicing these contracts were split evenly between Dakan and Commonwealth during the 18-month period. The loan was to be repaid quarterly from Dakan's net earnings. Commonwealth also acquired a 3-year right of first refusal to purchase Dakan's business.

As a result of the April 30, 1962 agreement, Standard accepted Dakan's assignment of his servicing agreement to Commonwealth. Penn, on the other hand, cancelled its agreement with Dakan and executed a new agreement with Commonwealth.

On January 11, 1962, Dakan requested a ruling from the Internal Revenue Service (IRS) concerning the tax consequences of a sale of his mortgage servicing business. The Service, in a reply dated August 14, 1962, declined to rule whether the proceeds from such a sale would be treated as capital gains or ordinary income. The Service, however, did note that it supported the Tax Court's decision in Nelson Weaver Realty Co., 35 T.C. 937 (1961), where the Tax Court held that proceeds from the sale of a mortgage service business represented consideration for the transfer of a fu-

2. Penn Mutual Life Insurance Company (Penn), Standard Insurance Company (Standard), and Northwestern Mutual Life Insurance Company (Northwestern).

3. Penn paid a commission each month amounting to $\frac{1}{12}$ of $\frac{1}{2}$ of 1 percent of the outstanding balance, and Standard and Northwestern paid $\frac{1}{12}$ of $\frac{1}{4}$ of 1 percent.

ture right to receive income and consequently should be treated as ordinary income. This decision was reversed on appeal, however, before Dakan sold his business (Nelson Weaver Realty Co. v. Commissioner, 307 F.2d 897 (5th Cir. 1962)). Dakan was notified of this reversal in a September 28, 1962 letter from Mr. Samuel E. Neel, General Counsel of the Mortgage Bankers' Association (MBA), of which Dakan was a member. The letter indicated that the *Fifth Circuit Court of Appeals* had ruled that a mortgage service contract, held for an extended period of time (8 years), was a "capital asset" whose sale, absent a specific contractual allocation, would require capital gains treatment. The letter concluded by pointing out that an amount paid. by a buyer for goodwill in the purchase of a mortgage correspondent business was not amortizable while an amount allocated as payment for the right to earn contract fees was amortizable as long as the service contract had a limited ascertainable life. Dakan forwarded all this information to Robert H. Andresen, counsel for Commonwealth, during the time he was engaged with Andresen in negotiating the sale of Dakan's business to Commonwealth.

At a meeting in October 1962, between Dakan and Commonwealth representatives Andresen, Holbrook and Yazzalino, Dakan was informed that Commonwealth intended to amortize the portion of the sale price allocated to the contract rights. It was suggested that Dakan obtain his own counsel for guidance during the negotiations, but Dakan declined, deciding instead to rely upon the integrity of the Commonwealth representatives. In his testimony, Dakan denied that any fraud, duress, or undue influence had been brought to bear upon him to enter into the agreement with Commonwealth or that any representative of Commonwealth had ever attempted to deceive him at any time with regard to the tax effect Commonwealth was attempting to incorporate into the sales contract. Dakan executed his sales

agreement with Commonwealth with full knowledge of Commonwealth's intent to gain tax advantages from the specific terms of the agreement. In doing this, Dakan apparently was under the mistaken impression that the allocation of the purchase price for tax purposes, offered by Commonwealth and made a part of the sale agreement, would not affect his own treatment and reporting of the transaction for tax purposes.

By an agreement of November 30, 1962, Dakan sold the mortgage loan correspondent business to Commonwealth for $200,000. The agreement reviewed the terms of the April 30, 1962 agreement between Commonwealth and Dakan calling for Dakan to solicit and develop business for Commonwealth in the San Jose area for 18 months and for Dakan to assign his contract rights under the Penn and Standard contracts as security for the $100,000 loan.

The sale agreement also itemized the property and assets to be sold. Commonwealth purchased Dakan's right to receive servicing income on the Penn and Standard loans made previous to April 30, 1962, and his right to the deferred renewal commissions on Northwestern loans made up to November 30, 1962, and thereafter. The balance of the itemization covered a lease, furnishings, supplies, and goodwill. The purchase price was specifically allocated in the contract among these assets. Individual values were assigned for the three contract rights and for the four "capital assets" mentioned above.

An immediate credit was given to Dakan for $57,500, the amount then outstanding on the $100,000 loan. The rest of the purchase price was paid to Dakan in four equal installments of $35,625 paid with interest in 1963 and 1964.

Dakan and his wife filed joint tax returns for·the years in question, 1962–1964, reporting the transaction on the installment basis in accordance with the provisions of § 453 of the Internal Revenue Code. Dakan reported the entire amount as gain from the sale of a capi-

tal asset. The Commissioner of Internal Revenue disallowed Dakan's treatment and assessed deficiencies, treating the proceeds from the sale of the contract rights as ordinary income.

Dakan protested this tax treatment unsuccessfully, paid the deficiencies, and brought this action for a refund.

Whether Dakan is entitled to a refund is a question of substance versus form. The plaintiff contends that the amounts assigned to the contract rights in the sale agreement ought to be broken down so that the elements which go to make up the value of such contract rights are given their required tax treatment. For the proposition, the plaintiff relies on Revenue Ruling 55–79, 1955 Cum.Bull. 370 and Bisbee-Baldwin Corp. v. Tomlinson, 320 F.2d 929 (5th Cir. 1963), among others.

> Revenue Ruling 55–79 indicates that: For Federal income tax purposes, the sale of a going business operated as a sole proprietorship does not constitute the sale of a single asset. Such a sale constitutes a sale of the individual assets comprising the business. For the purpose of determining whether the gain on the sale of a particular asset is to be included in the gross income as an item of ordinary income or whether it is to be treated as gain from the sale of a capital asset, all of the individual assets sold must first be classified * * *.

*Bisbee-Baldwin* dealt with the sale of a mortgage loan correspondent business. The Fifth Circuit held that assets of a mortgage loan business included both capital and noncapital items and, consequently, such assets had to be examined carefully in order to be accorded their proper tax treatment. The court followed its practice in previous cases of describing *Bisbee-Baldwin's* assets as a "bundle" of rights. *See,* Nelson Weaver Realty Co. v. Commissioner, *supra*; Commissioner v. Killian, 314 F.2d 852 (5th Cir. 1963). Part of the "bundle" which *Bisbee-Baldwin* sold was its right to receive annual servicing com-

missions on the principal balance outstanding on the mortgages. The court ruled that the consideration paid for this substantial right to receive future income should be taxed as ordinary income since it was "a substitute for the income which would have been earned by *Bisbee-Baldwin* had the contracts not been transferred," 320 F.2d at 934. This holding followed the rule set out in Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958) that present payments for the right to receive future income are taxable as ordinary income.

The rest of the "bundle" in *Bisbee-Baldwin,* however, was deemed to consist of capital assets. Among those items identified were: the value of the mortgage loan business as a "feeder" for other business, including insurance and real estate; the positive effect on the servicing agent's credit rating caused by the monthly deposits of escrow payments in his bank account; the extensive files and records maintained by the servicing agent; and finally, goodwill—the likelihood that past and present customers will do business at the same place in the future. As the court stated in *Bisbee-Baldwin, supra:*

> * * * * * *

> These items are closely related to the everday business operations of the taxpayer. They are not so integrally related, however, as to be insusceptible of separate valuation. 320 F.2d at 935.

The plaintiff contends that the same sort of separate valuation ordered in *Bisbee-Baldwin* and Rev.Rul. 55–79 should be made with respect to the Dakan-Commonwealth sale agreement. Dakan urges that the $161,543.80 paid by Commonwealth for the contract rights be allocated in the following manner: $10,000 for the use of the escrow funds; $36,600 for the files and records; $60,000 for the right to originate loans; and $54,943.80 for the right to service mortgage loans solicited for the three insurance companies. Under this alloca-

tion, plaintiff would be entitled to capital gains treatment on all but the $54,943.-80 allocated to the right to service the previously solicited mortgage loans.

In advocating such treatment, however, plaintiff disregarded the important differences between his case and *Bisbee-Baldwin*. No agreement between the parties, such as was made between Dakan and Commonwealth, existed in *Bisbee-Baldwin;* nor was there a specific, bargained-for allocation of the purchase price, such as appeared in the sale agreement between Dakan and Commonwealth. *Bisbee-Baldwin* only received net termination fees after various investors had cancelled their servicing agreements with *Bisbee-Baldwin* and had given their business to other agents, 320 F.2d at 931. The court, in a 2–1 decision, found that the transaction was, in substance, a two-party transfer in which *Bisbee-Baldwin* transferred its rights to the servicing contracts to its successor agents. 320 F.2d at 936.

■ In the present case, the purchase price was allocated among the assets of the Dakan business with the full knowledge and acquiescence of Robert Dakan. The allocation was part of the bargain which the two parties reached. The trial transcript reflects this fact:

Cross-examination of Dakan by Mr. Schwarz.

Q Did Mr. Holbrook [of Commonwealth] make it clear to you [Dakan] that portions which you had contracted with him to allocate to your rights in the contract with each of the insurance companies stated in that agreement would be amortized on a tax return to Commonwealth?

Did he or did he not state that or make that clear to you?

A [Dakan] Well, Mr. Holbrook or Mr. Andresen [Commonwealth's attorney] or Mr. Yazzolino [another Commonwealth representative] or somebody did state that. I am not sure which individual propounded it.

Since the right of Commonwealth to amortize that part of the purchase price

allocated by the parties to the contract rights with the three insurance companies was an integral part of the bargain made by the two parties, and since any decision in the plaintiff's favor changing the effect of this bargain will adversely affect Commonwealth's tax treatment of the transaction, the *Bisbee-Baldwin* rationale will not be applicable here. This determination is not reached lightly. The plaintiff has offered a strong argument favoring allocation of the contract rights without regard for the terms of the Dakan-Commonwealth agreement. The fact remains, however, that the plaintiff bargained away his right to allocate the bundle of contract rights transferred to Commonwealth. Accordingly, he is estopped to advocate any "sub-allocation" of the terms of the sale agreement. To grant such a "sub-allocation" in face of the facts present in this case would cause a significant, harmful effect on the stability of any future allocations in cases similar to this one.

In Commissioner v. Danielson, 378 F. 2d 771 (3d Cir. 1967) (4–3 opinion), cert. den. 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967), the Third Circuit reversed the Tax Court and held that parties are bound by the tax consequences of their sale agreements absent proof sufficient to void the legal effect of the agreement.

\* \* \* \* \* \*

[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc. Commissioner v. Danielson, *supra*, at 775.

The Third Circuit reached its holding in *Danielson* even though it found sufficient evidence to support the Tax Court's finding [44 T.C. 549 (1965)] that the sum ($152 of the $374 per share price) allocated to a seller's covenant not to compete had no independent

basis or arguable relation with business reality. 378 F.2d at 774. The Third Circuit rejected the traditional argument that the legitimate operation of the tax laws should not be determined by the form of a transaction [Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935)] and reached an opposite determination for very substantial reasons.

■ In the first place, the court thought it important in *Danielson* to determine whether a covenant not to compete had actually been executed since an amount paid for such a convenant is an amortizable expense for a purchaser and must be treated as ordinary income by a seller. Ullman v. Commissioner, 264 F. 2d 305 (2d Cir. 1959). Goodwill, on the other hand, cannot be amortized by a purchaser since it has no limited ascertainable life. The proceeds from the sale of goodwill, however, can be reported as a capital gain by a seller. Thus, the *Danielson* court thought it exceedingly probable that parties to transactions would determine the financial aspects of an agreement for a purchase or sale of a business with reference to the tax consequences that the terms of such an agreement would engender. With this in mind, the court concluded that:

\* \* \* \* \* \*

[T]o permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant, at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment. Commissioner v. Danielson, *supra,* at 775 of 378 F. 2d.

Second, the court pointed out that if such attacks on the agreements reached by parties to a transaction were permissible the predictable tax consequences of all agreements would be lost. Parties would be forced into the courtroom in order to protect the nature of their purchase and sale agreements.

Finally, the court was wary of the tax administration problems that would be caused if parties to transactions were free to advocate mutually repugnant tax characterizations for their transactions.

Despite the fact that this case does not involve a covenant not to compete as did *Danielson,* the rationale applied in that case is still pertinent here.

■ The facts of this case irrefutably indicate that the bargain which Commonwealth reached with Dakan established contractual terms favorable to Commonwealth's own tax purposes. Dakan realized that Commonwealth was attempting to write such language into the sale agreement and was content to believe that it could ignore such terms and file its tax return in a manner favorable to its own tax purposes. In this belief, Dakan was mistaken. The principle that one party to a contract should not be able to alter the tax consequences of his agreement to the detriment of the other party once the agreement has been consummated is too well established.

In St. Louis-San Francisco Railway Co. v. United States, 444 F.2d 1102, 95 Ct.Cl. 343, 350–351 (1971), cert. denied 404 U.S. 1017, 92 S.Ct. 678, 30 L.Ed.2d 665 (1972), this court recently rejected an attempt by a taxpayer to recharacterize the tax consequences of an exchange of income debentures and no-par common stock for preferred stock having a par value equal to the face value of the debentures. Taxpayer attempted to convince the court to assign a value to the common stock in an effort to support its claim that an amortizable debt discount had been incurred in the exchange. The court rejected this proposition, noting that "[c]ommon stock is not a fixed debt obligation" by whose issue an issuer makes a "definite obligation for the future." 195 Ct.Cl. at 351, 444 F.2d at 1106. The court indicated that it was difficult for the preferred shareholders of St. Louis-San Francisco Ry. to assume that any additional interest had been

given in the exchange on account of the issuance of the common stock. The court concluded its consideration of taxpayer's agreement by indicating that:

\* \* \* \* \* \*

The taxpayer cannot alter or repudiate its bargain to the detriment of the other side of the exchange, at this late date, in order to obtain a tax advantage for itself. Id.

Dakan is attempting to do precisely the same thing in this case as was attempted in St. Louis-San Francisco Ry. He urges this court to satisfy his own tax whimsey by upsetting the terms of the sale agreement specifically bargained for by Commonwealth. This, the court cannot rightfully do accordingly, it is concluded that the plaintiffs are not entitled to recover and their petition should be dismissed.