ROMAN V, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Roman V, Inc. v. Commissioner
Docket No. 19022-85.
United States Tax Court
T.C. Memo 1987-3; 1987 Tax Ct. Memo LEXIS 3; 52 T.C.M. (CCH) 1278; T.C.M. (RIA) 87003; January 5, 1987. *3 P's business is the operation of a massage parlor. Four months into the first fiscal year before the Court, P's management (fearing a "rub out") was forced out of the operation by Dante "Tex" Gill, who operated a string of massage parlors as a cover for prostitution activities. Held, the Commissioner's determination of P's gross income, based upon the wages of attendants furnishing sex-related services on P's premises, was arbitrary and erroneous. Anastasato v. Commissioner,794 F.2d 884 (3d Cir. 1986), vacating and remanding T.C. Memo. 1985-101, decided on remand T.C. Memo. 1986-400; and Sullivan v. United States,618 F.2d 1001 (3d Cir. 1980), followed. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), applied. Allen N. Brunwasser, for the petitioner. Frank A. Falvo, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Judge: Respondent determined the following deficiencies in and additions to petitioner's Federal income taxes: Fiscal
Year
Additions to Tax
Ended
Deficiency
[1] *4 Sec.6651(a)(1) Sec.6653(a)(1)
Sec.6653(a)(2)
Sec. 6661
May 31,
1982
$134,008
$6,700
50% of the
interest due
on $134,008
May 31,
1983
145,725
21,859
7,286
50% of the
14,573
interest due
on $145,725
The issues for decision for both of the taxable years are: (1) Whether petitioner had underreported gross receipts of $560,215 and $557,766 for the taxable fiscal years ended May 31, 1982, and May 31, 1983, respectively; (2) Whether petitioner is entitled to wage expenses in amounts equal to 36 percent of gross receipts, as allowed in the deficiency notice; (3) Whether petitioner is liable for the additions to tax for negligence under sections 6653(a)(1) and 6653(a)(2) for each taxable year; (4) Whether petitioner is liable for the addition to tax for late filing of a tax return under section 6651(a)(1) for the Nay 31, 1983, year; and (5) Whether petitioner is liable for the addition to tax for substantial understatement of tax under section 6661 for the May 31, 1983, year. FINDINGS OF FACT None of the facts have been stipulated. At the time its petition was filed, petitioner was a Pennsylvania corporation with its principal office and place of business located in Pittsburgh, Pennsylvania. As *5 of June 1, 1981, the first day of the first fiscal year in question, and at all relevant times subsequently, 51 percent of petitioner's stock was owned by Charles E. Gibson. Petitioner's business is the operation of what is euphemistically called a massage parlor. The massage parlor is located on the third floor of a building located at 801 Liberty Avenue in Pittsburgh. During the years at issue, the premises were rented from the operators of an "adult bookstore" called Sneak-a-Peek located on the second floor of the Liberty Avenue building. During the time Gibson operated petitioner's business, petitioner paid rent calculated at 10 percent of gross receipts. On a May 31, 1982, fiscal year tax return filed in petitioner's name, a rent deduction of $6,624 was claimed, and gross receipts of $66,240 were reported. The operators of Sneak-a-Peek tested the accuracy of petitioner's stated gross receipts in the following manner: one of the operators of Sneak-a-Peek would sit by the door of his establishment with a timer in hand and count petitioner's customers as they climbed the stairs to the third floor, where Roman V was located. A Federal income tax return (Form 1120) was also filed *6 in petitioner's name for the taxable year ending May 31, 1983, on November 14, 1983. Roman V's May 31, 1983, corporate income tax return was signed on behalf of petitioner by Hazel Besselman as an officer and Raymond Oshop as return preparer. Roman V's May 31, 1983, corporate income tax return was signed by T. A. Clipp as an officer and Oshop as return preparer. On or about October 1, 1981, a woman named Dante "Tex" Gill sent a strong-arm man named Tom Clipp to petitioner's premises and told one of petitioner's shift managers, Hazel Besselman, to leave the premises and to deliver a message to Gibson. The message was that Gibson and James Duncan, Gibson's general manager, were to stay out of town and away from Roman V. Gibson had heard rumors of violence perpetrated by Tex Gill and Tom Clipp against an uncooperative massage parlor operator, so Gibson decided to stay in McKeesport, Pennsylvania, where he lived and away from Roman V. Gibson feared that harm would be done to himself and to members of his family. Gibson did not return to the premises of Roman V until February, 1985, when he "got the tax thing" (i.e., a communication from the IRS) and went to talk to his lawyer, Allen *7 Brunwasser. Brunwasser told Gibson to go to Roman V and take over again. When Gibson and his son walked into the Roman V premises, they found "a big mess" and nobody in charge. In addition to her involvement with Roman V, Gill also ran massage parlors in the Pittsburgh area under the names of the Airport Executive, the Aardvark, the Spartacus and Japanese Meditation Temple. After Gill commandeered Roman V in October, 1981, the premises were remodeled and Roman V was turned into a "full-service" establishment, meaning that sexual services were provided. On January 18, 1985, the IRS made a jeopardy assessment against petitioner for failure to withhold and pay employment taxes. At that time Gibson gave a collection officer named Pifer such books and records of Roman V as were in his possession, relating to a period before Gill took over, which books and records reflected rent paid on the basis of a percentage of gross receipts. Gibson never got the books and records back. Fred Gadelmeyer was Roman V's accountant before the Gill usurpation.However, the Roman V tax return for the fiscal year ended May 31, 1982, was prepared by Oshop, a certified public accountant who worked for Gill *8 and who took over the accounting work for Roman V after Gibson was forced out. Prior to the May 31, 1982, fiscal year, the corporate income tax returns of petitioner were prepared by Gadelmeyer. Oshop never talked to Gadelmeyer about Roman V's books. He got copies of prior years' returns from Clipp who, he believed, got them from Gibson. Before the trial of this case, Oshop had never met Gibson face to face, although he talked with him several times by phone in connection with the fiscal 1982 tax return preparation. At a criminal trial in which Oshop was a defendant, he heard a taped conversation between an FBI undercover agent and Clipp indicating that there was a "lot more money going through that corporation [Roman V] than was given to me to prepare the tax return." The agent, who was "wired for sound," was masquerading as a cigarette vending machine salesman. Gibson was at all relevant times chairman of the board of Roman V. On October 8, 1981, Clipp was elected president of Roman V. On December 18, 1981, Besselman was elected president. On December 18, 1981, Oshop was elected secretary and treasurer. Prior to October, 1981, Gibson's wife was the bookkeeper for petitioner *9 and made all the entries in the books and records. At all relevant times, petitioner maintained its bank accounts at Equibank in Pittsburgh. As of October, 1981, Roman V maintained two bank accounts at Equibank: a regular account and a tax account. The account number for the regular account was XXXX-XX4-666 and the account number for the tax account was XXX-XX4-365. As of October, 1981, Gibson had signature authority over Roman V's regular bank account and tax account at Equibank. On October 9, 1981, Resolutions of the Board of Directors of Roman V were executed by Gibson, as chairman of the board, whereby Clipp was given signature authority over bank account number XXXX-XX8-525, in the name of Roman V at Equibank. These resolutions also specifically named Clipp as the duly elected president of Roman V. On December 18, 1981, subsequent board of directors' resolutions were executed by Gibson, as chairman of the board, whereby signature authority over account number XXXX-XX8-525 was changed from Clipp to Besselman and Oshop. These resolutions specifically provided that Besselman was president of Roman V and Oshop was secretary and treasurer. On January 12, 1982, Roman V established *10 a "rent escrow account" at Equibank bearing account number XXXX-XX1-206. As chairman of the board, Gibson executed on January 12, 1982, Resolutions of the Board of Directors of Roman V whereby Gibson was given signature authority over petitioner's rent escrow account. Pursuant to these corporate resolutions, signature authority over petitioner's rent escrow account was also given to Besselman as president. On January 12, 1982, a signature card for Roman V's rent escrow account (No. XXXX-XX1-206) was executed by Gibson, as chairman of the board, and Besselman, as president. This card authorized Equibank to recognize the signatures of either Gibson or Besselman with respect to that bank account. Some of the corporate books and records of petitioner which were maintained prior to October, 1981, were kept at the residence of Gibson and not at the offices of Roman V. Copies of Roman V's corporate income tax returns for the taxable years prior to May 31, 1982, were kept at Gibson's residence. None of petitioner's bank accounts which existed as of October, 1981, was closed by Gibson after the business was seized by Gill. Gibson did not file or cause to be filed any state or Federal tax *11 returns which reflected that petitioner was no longer in business after October, 1981. No action was ever taken by Gibson or any other individual to revoke the corporate charter of petitioner or to elect to dissolve the corporate existence of petitioner. In order to prepare Roman V's income tax return for the 1982 fiscal year, Oshop questioned Gibson by telephone regarding the rental escrow account maintained by Roman V.Gibson explained to Oshop that 10 percent of the gross receipts of Roman V were placed into an escrow account upon the recommendation of Brunwasser. Gibson further explained to Oshop that the rent escrow account was a separate bank account maintained and controlled by Roman V, into which the rental payments due the landlord were deposited. The reason for depositing these rental payments into the escrow account was because petitioner was involved in a lawsuit with its landlord, Sneak-a-Peek. The lawsuit arose as a result of the landlord's attempt to evict Roman V from its premises. During Gibson's discussions with Oshop, Gibson was adamant that the rental payments continue to be deposited into the escrow account. Gibson insisted that the rent expense at the end of *12 the year reflect 10 percent of petitioner's reported receipts. Gibson asked Oshop to make certain that the payments were deposited into the account. The discussion between Gibson and Oshop regarding the deposits into the rental escrow account occurred sometime in June, 1982. The Court on its own motion takes judicial notice that in an unpublished opinion promulgated April 9, 1986, the Third Circuit Court of Appeals affirmed that Dante "Tex" Gill was convicted in the United States District Court for the Western District of Pennsylvania on one count of conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the collection of taxes, 18 U.S.C. section 371 (1982); on three counts of knowingly aiding and assisting in the preparation and presentation of false and fraudulent corporate income tax returns, 26 U.S.C. section 7602(2) (1982); and on one account of knowingly making and subscribing a corporate income tax return that she did not believe to be true and correct, 26 U.S.C. section 7206(1) (1982). The gravamen of the government's case was that Gill had failed to report on her income tax returns much of the income she had earned from the operation of *13 a chain of massage parlors in the Pittsburgh area that were "covers" for prostitution activities. Gill was sentenced to imprisonment for 13 years, subject to conditions that effectively reduced the prison sentence to five years, with five years' probation to follow. She was also fined a total of $30,000, plus costs of prosecution. The Court also takes judicial notice that, as affirmed by the Circuit Court in the same opinion, Raymond Oshop was found guilty on one count of conspiracy under 18 U.S.C. section 371 (1982) and two counts of knowingly aiding and assisting in the preparation and presentation of false and fraudulent corporate income tax returns, 26 U.S.C. section 7206(2) (1982). A third individual, Cynthia Bruno, an employee of Gill, was also convicted in the same trial on one count of conspiracy under 18 U.S.C. section 371 (1982). The trial of this case commenced May 28, 1986, 49 days after the date of the Circuit Court's opinion. The record in this case does not disclose that Gibson was involved in any way in the aforementioned criminal trial. One of respondent's witnesses, Lynn Ferguson, a one-time employee of Tex Gill at Roman V and other massage parlors, testified in *14 the Gill-Bruno-Oshop criminal trial. Ferguson voluntarily presented information to the United States Attorney about Gill's activities because she, Ferguson, felt that her life was in danger and that Gill needed to be prosecuted. At the time of the Tax Court trial, Ferguson was under Federal protection. OPINION In the statutory notice of deficiency, respondent's method of determining petitioner's taxable income is explained as follows: In the absence of adequate records, your taxable income for the fiscal years ended May 31, 1982 and May 31, 1983 has been determined based on third party testimony. From said testimony, the number of customers, usual services purchased, and the cost of such services could be determined and the gross receipts computed. At the trial, respondent attempted to establish petitioner's gross income for the two years in issue by first establishing the wages paid to the female "attendants" furnishing sex-related services at Roman V during those years, and then extrapolating gross income from the wages so determined on the basis that the attendants' wages constituted 36 percent of petitioner's gross income. Petitioner argues that the income generated from the *15 Roman V massage parlor was not earned by petitioner during the years at issue; that if the income so generated is income to petitioner, then petitioner is entitled to a theft loss deduction in an equal amount; that the deficiency notice was arbitrary; and that respondent's failure to answer petitioner's discovery requests mandates a decision in petitioner's favor. For convenience, we deal with respondent's gross income methodology and petitioner's first three arguments simultaneously. Since we find for petitioner, for reasons hereinafter stated, we need not deal with petitioner's discovery argument. Respondent's witness, Lynn Ferguson, testified that Roman V was open 365 days per year and 24 hours per day. Her share of the income generated by her activities was equal to 36 percent of the amounts paid by her customers. During the time Ferguson worked at Roman V her weekly net pay was approximately $250 when she worked the graveyard shift, $275 when she worked the daylight shift and $325 when she worked the evening shift. Respondent's witness, Darlene Argyle, who was younger than Ferguson, testified that she received net pay ranging from approximately $300 to $500 per week while *16 employed at Roman V, regardless of the shift she worked. Based upon the testimony of Ferguson and Argyle, respondent estimates that the average net pay of the attendants at Roman V was as follows: Average Weekly
Shift
Net Pay
Daylight
$337.50 Evening
362.50
Graveyard
325.00
Respondent further estimates, based upon the testimony of the above witnesses, that the minimum daily number of attendants working at Roman V was five on the daylight shift, five on the evening shift and three on the graveyard shift. Based upon the above testimony and analysis, respondent argues that the average weekly net pay of all of the attendants employed at Roman V may be determined by multiplying the average weekly net pay of the attendants per shift by the minimum number of attendants working that particular shift. The total weekly net pay of the five attendants working the daylight shift is $1,687.50 ($337.50 X 5); the total weekly net pay of the five attendants working the evening shift is $1,812.50 ($362.50 X 5); and the total weekly net pay of the three attendants working the graveyard shift is $975.00 ($325.00 X 3). Therefore, the average weekly net pay of all of the attendants employed at Roman V is $4,475.00, *17 the sum of the weekly net pay per shift. The average net pay of the attendants for the entire year is $232,700.00 ($4,475.00 X 52 weeks). Since the attendants' net pay represents 36 percent of the total gross receipts received by petitioner from the attendants' services, petitioner's gross receipts are determined by dividing the total annual net pay of the attendants ($232,700.00) by 36 percent, or $646,388.88. This amount, argues respondent, reasonably represents the total gross receipts of petitioner for each of the two taxable years at issue, and supports the gross income determination set forth in the notice of deficiency. Petitioner's only witness was Charles E. Gibson, the 51 percent stockholder of petitioner at all times relevant herein. Respondent's substantive witnesses were Raymond Oshop, a convicted felon, and the two female massage parlor attendants mentioned above, both of whom admitted to having been prostitutes during the years in question. In light of the nefarious activities giving rise to this case, the failure of the parties to stipulate facts [2] and the disruptive behavior of petitioner's counsel throughout the trial, [3] it is not surprising that the testimony *18 was fragmentary, confused, contradictory, disjointed and often unconvincing. Nevertheless, from the points at which the testimony of the various witnesses intersects, it is possible to piece together a consistent picture of the relevant facts. As previously noted, respondent called two Roman V attendants as witnesses to establish the amount of wages and the basis on which they were paid. Respondent also made offers of proof of the testimony of two additional attendants. This latter testimony was excluded by the Court on the ground that it would have been cumulative and a waste of time. Rule 403, Federal Rules of Evidence.
While respondent no doubt deemed the testimony of the attendants necessary to establish his case, in unfortunate side effect *19 of the testimony, from respondent's point of view, was that it tended to corroborate petitioner's position that any income earned at Roman V was not petitioner's. Petitioner's witness Gibson testified that in late September or early October, 1981, Dante "Tex" Gill, via her strong-arm man, Tom Clipp, muscled in on Gibson's operation and thereafter ran the Roman V operation essentially for Gill's own benefit. The two attendants strongly corroborated Gibson's testimony on this point. The manner in which Roman V was operated after Gill came on the scene left no doubt in the mind of either attendant that Gill was running Roman V as its putative owner. In addition, both attendants and Oshop were consistent in their testimony that Gibson was never seen on the Roman V premises after Gill took over in late September or early October, 1981, and until she was prosecuted in early 1985. Gill was indisputably connected by all of the substantive witnesses with the activities at Roman V during the years in question. And as we have found, she was convicted for various income tax-related offenses in a trial in which the gravamen of the government's case was that Gill had failed to report on her *20 income tax returns much of the income she had earned from the operation of massage parlors in the Pittsburgh area that were covers for prostitution. This does not of course establish, in the absence of the record in the criminal trial, that the conviction was based on any income from Roman V for the years in question. However, we have also found that Gill was given a minimum five-year prison sentence following her conviction, and that the conviction was affirmed by the Third Circuit only 49 days prior to the commencement of the trial in this case. It is therefore reasonable to suppose that Gill was readily available to testify pursuant to a motion for a writ of habeas corpus ad testificandum (see Rule 21(b)(3)), had either party seen fit to call her. Respondent attempts to rebut the unfavorable testimony by a showing that even after the October, 1981, takeover by Gill, bank documents continued to be signed by Gibson as chairman of the board of Roman V, Inc. The impact of this point is substantially mitigated, however, by the fact that except for the rent escrow account, Besselman and Oshop had independent check-signing authority over the various Roman V bank accounts.We are satisfied *21 that after the takeover both worked for Gill, not Gibson. Respondent also points to the fact that Gibson and Oshop talked several times by telephone in connection with the 1982 corporate return preparation by Oshop, thus manifesting continuing involvement by Gibson in the affairs of Roman V after the Gill takeover. We think it likely that Gibson did, in fact, continue to be involved, and even that some Roman V income might have inured to his benefit. Oshop testified, and we have no particular reason to doubt him on this point, that both Gibson and his lawyer, Brunwasser, were very concerned that money continue to be paid into Roman V's rent escrow account. This was because Roman V and Sneak-a-Peek were involved in an eviction dispute. Such a concern on Gibson's part strongly infers some continuing interest by him in the financial affairs of Roman V. Nevertheless, we are satisfied that petitioner has established Gill's conversion of the major part of the income earned at Roman V after her takeover. Oshop testified that he heard it said on the secret FBI tape -- the existence of which respondent's counsel admitted -- played at the criminal trial that large amounts of money passed through *22 Roman V, and we are convinced that these amounts went to Gill, not Gibson. Gibson feared for his own safety and that of his family and it is logical to assume that his only choice was to accept what money, if any, Gill saw fit to let him have. Respondent's deficiency notice states that his methodology was utilized "[i]n the absence of adequate records." Neither party focused at the trial on the question of adequate records, although Oshop testified that some documents, which he believed came from Gibson, were made available in connection with Oshop's preparation of the fiscal 1982 corporate return. Respondent did not offer the testimony of the examining revenue agent to explain the absence of reliance on records or to justify reliance upon the methodology used to determine petitiner's gross and taxable income. If we accept, as we do, Gibson's testimony that he and his general manager, Duncan, were barred from the Roman V premises after Gill's takeover, it is difficult to see how Gibson could be charged with the responsibility for maintaining accurate books and records on behalf of petitioner after the takeover date. Based upon the uncontroverted testimony in this case (a substantial *23 part of which came from respondent's own witnesses) that Gill ran Roman V as the "owner" after the September-October, 1981, takeover, we think it is reasonable to assume that she received substantial amounts from the prostitution operation which she was conducting at Roman V. This income cannot be attributed to petitioner. Petitioner, of course, has the burden of proof as to the income tax deficiency, Rule 142(a), and respondent's deficiency notice is afforded a presumption of correctness. Anastasato v. Commissioner,794 F.2d 884, 886 (3d Cir. 1986), vacating and remanding T.C. Memo. 1985-101, decided on remand T.C. Memo. 1986-400. It is also well settled that, in the absence of sufficient books and records, respondent may reconstruct a taxpayer's income by any method which is reasonable. Holland v. United States,348 U.S. 121 (1954); Cupp v. Commissioner,65 T.C. 68 (1975), affd. by unpublished opinion 559 F.2d 1207 (3d Cir. 1977); see Genneken v. Commissioner,T.C. Memo. 1985-30. Furthermore, we would not be prepared to say that respondent's method of determining income would have been unreasonable in this case were this simply a matter of inadequate or missing books and records. *24 However, regardless of whatever other defects it may contain, all of the testimony in this case is consistent with the hypothesis that since Gill took over Roman V approximately four months into Roman V's first fiscal year, and since Gibson was never again on the premises until long after May 31, 1983, the close of petitioner's second and last fiscal year before the Court, then most of the income from the prostitution performed on the premises during that period went to Gill, not petitioner. From this we are forced to conclude that respondent's methodology has been applied to the wrong taxpayer: it has been applied to petitioner when it should have been applied to Gill. In Sullivan v. United States,618 F.2d 1001 (3d Cir. 1980), the Third Circuit Court of Appeals held that if the taxpayer rebuts the presumption of correctness attaching to the the deficiency notice with credible and relevant evidence sufficient to establish that the Commissioner's determination was erroneous, the procedural burden of going forward with the evidence shifts to the Commissioner. 618 F.2d at 1008. See Anastasato v. Commissioner,794 F.2d at 887. The Third Circuit is the Court to which an appeal in this *25 case would lie, and we apply the Sullivan rule, as amplified by Anastasato, in this case. Golsen v. Commissioner,54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). In Anastasato the Circuit Court, in applying Sullivan, further held that if the taxpayer offers evidence that the Commissioner's determination was incorrect and the Commissioner offers no evidence to support the determination, the taxpayer will have met his ultimate burden unless such evidence is specifically rejected as "improbable, unreasonable, or questionable." 794 F.2d at 887. While respondent of course offered some evidence to support the determination, we think the weight of the evidence clearly supports petitioner. Obviously, for the reasons stated, we cannot reject the entire weight of the evidence that Gill seized and ran Roman V for her own benefit on the ground that it was improbable, unreasonable, or questionable. Under the rule of Helvering v. Taylor,293 U.S. 507 (1935), where, as here, the taxpayer's evidence shows the Commissioner's determination to be arbitrary and excessive, it is not incumbent upon the taxpayer to show the correct amount of tax due, if any. In this case, that would in any event *26 have been an impossibility under the circumstances. Respondent has determined additions to tax for negligence, late filing and substantial understatement of tax, all as percentages of the income tax deficiencies determined for the two years in issue. Petitioner's returns reflected no tax due for the years in issue. Since we have held that respondent's income tax determination was erroneously made, it follows that there are no additions to tax due. To reflect the foregoing, Decision will be entered for the petitioner.
Footnotes
1. Except where noted, all section references are to sections of the Internal Revenue Code in effect for the years in question, and all rule references are to the Tax Court Rules of Practice and Procedure.
2. Rule 91(a) requires the parties to stipulate facts to the fullest extent possible. Rule 91(f) provides for a Motion to Compel Stipulation by a party where the opposing party refuses or fails to confer or to stipulate.↩
3. For examples of similar professional misbehavior by petitioner's counsel see Brunwasser v. Commissioner,T.C. Memo. 1986-196, Brunwasser v. Commissioner,T.C. Memo. 1986-197, and Brunwasser v. Commissioner,T.C. Memo. 1986-198↩.