William F. SULLIVAN and Rosemary C. Sullivan, Appellants,

v.

UNITED STATES of America.

No. 79-1240.

United States Court of Appeals, Third Circuit.

Argued Dec. 12, 1979.

Decided April 7, 1980.

As Amended May 7, 1980.

Charles Weiss (argued), Frank Mast, W. Rodgers Moore, Jeffrey S. Blum, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellants.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Carleton D. Powell (argued), James A. Riedy, Attys., Tax Division, Dept. of Justice, Washington, D. C., for appellee; Robert J. Cindrich, U. S. Atty., Pittsburgh, Pa., of counsel.

Before ADAMS, ROSENN and SLOVI-TER, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This appeal is brought by federal taxpayers[1] to recover $293,904.63 in federal income taxes, plus interest, levied on income gained from a sale of unimproved real estate and the contemporaneous yet separate assignment of a package of agreements to lease premises to be developed on that land. The taxpayers claim that the district court erred in upholding the government's determination that, for federal income tax purposes, the taxpayers were bound by the form of the transaction which allocated the major portion of the total sale proceeds to the assignment of the leases. Alternatively, the taxpayers dispute the district court's conclusion that they failed to satisfy their burden of proving that the government erred in deciding that 35 percent of the income recognized from the assignment of the leases was attributable to leases held for less than six months, and thus subject to short-term rather than long-term capital gain treatment. Because we find no error in the district court's decision on either issue, we affirm.

### I.

After purchasing approximately 57 acres of real estate near Pittsburgh, Pennsylvania, in 1952, William F. Sullivan decided to develop a shopping center on the site. In order to obtain financing for the proposed center, Sullivan secured agreements with several large department stores whose presence was deemed essential in order to attract smaller businesses as tenants. The initial agreement reached was with Gimbel Brothers, Inc., whereby Sullivan conveyed 12.094 acres of the property in question to Gimbels in exchange for Gimbels' promise to build and to maintain for twenty-five years at its own expense a retail store at that location, provided that Sullivan develop a shopping center on the rest of the site. Subsequently, Sullivan entered into long-term agreements with a number of other large retailers to lease premises yet to be constructed as part of the proposed development.

Despite his success in assembling these various lease agreements, Sullivan nevertheless encountered difficulty in securing financing for the project. At this point, Sullivan was approached by Samuel M. Hyman of the West Penn Realty Company on behalf of a group of investors interested in acquiring the property from Sullivan. On July 3, 1962, Sullivan and East Arlington, Inc., a corporation owned by his wife and son that had acquired a minor interest in the 57 acre tract, entered into an informal agreement to convey the land and to assign all leases then executed with prospective tenants to the group represented by Hyman. The total consideration was to be $1,500,000, of which $250,000 was allocated to the land and $1,250,000 to the leases. This informal agreement was later reduced to writing in three documents. On July 19, 1962, Sullivan and East Arlington, Inc. executed an "Assignment of Leases" by which they assigned to the purchasers all of their interest in leases presently signed and executed, as well as any future leases that they might procure pertaining to the proposed shopping center, in consideration of $1,250,-000.

As of that date, the purchasers apparently not only became entitled to any rent due in the future under the leases but also assumed all obligations under them, and the prospective lessees were so notified. Subsequently, on August 31, 1962, a second assignment of leases, which substantially reiterated the provisions of the earlier assignment, was executed, together with a deed transferring the land in question. In addi-

---

1. As the district court noted, William F. Sullivan and Rosemary C. Sullivan are joined as coplaintiffs in this action apparently because the couple filed a joint federal income tax return for the year in question. Mrs. Sullivan does not appear to have participated in either the negotiations regarding the transactions at issue or in the preparation of the return. 461 F.Supp. 1040, 1041 n.1 (1978).

tion to reciting a separate consideration of $250,000 for the fee interest, the deed stated that the conveyance of land was to include all "improvements, privileges, hereditaments and appurtenances whatsoever thereunto belonging or in anywise appertaining, and the reversion and remainders, rents, issues and profits thereof; and all the estate, right, title, interest, property, claim and demand whatsoever . . ." of the seller. Although Hyman testified that he paid Sullivan "what he asked" for the land and leases, Hyman also stated that the total purchase price was based on a percentage of the expected return on the leases. Apparently, it was Hyman's idea to classify the assignment of the lease package separately from the conveyance of the fee interest, and to allocate the total purchase price between them.

In conformance with the structure of this transaction, Sullivan treated the assignment of the lease package and the conveyance of the real estate as sales of separate assets on his federal income tax return for 1962. He reported the entire gain from the sale of each of those assets as a long-term capital gain, and elected installment sale treatment. At the time in question, income derived from sale of short-term capital assets—assets held for less than six months—was taxable as ordinary income, while gain derived from sales of longterm capital assets—assets held for at least six months—was taxed at fifty percent of ordinary rates. Upon audit, however, the Internal Revenue Service (I.R.S.) denied installment-sale treatment and took the position that whatever portion of the $1,250,000 gain recognized on the sale of the leases was allocable to leases other than those executed at least six months prior to the sale would be considered a short-term rather than a long-term capital gain. Further, the I.R.S. determined that 35 percent of the total gain

recognized on the sale of the entire package of leases was attributable to leases executed within six months of the transaction, and thus subject to taxation as ordinary income.

Sullivan paid the additional tax assessed, but ultimately filed the present refund action against the government seeking to recast the transaction as the sale of a single capital asset held for more than six months, rather than as a sale of two separate assets. Alternatively, Sullivan claimed that the government's determination regarding the value of the leases executed within six months of the sale was erroneous. After a trial without a jury, the district court held that the I.R.S. properly treated the assignment of the lease package as a sale of an asset separate from the conveyance of the property, inasmuch as the parties had so structured their transaction. Additionally, the court held that the taxpayers did not meet their burden of showing that the government erred in treating 35 percent of the income from the sale of the lease package as short-term capital gain. On appeal, Sullivan claims that the district court erred in reaching these determinations.

## II.

■ In holding that Sullivan was bound for federal income tax purposes by the form and terms of the agreement, the district court relied specifically on the rule of law enunciated by this Court, sitting in banc, in *Commissioner v. Danielson*, 378 F.2d 771 (1967).[2] *Danielson* involved the purchase and sale of a small loan company. At the purchasers' request, the parties to the transaction expressly agreed to allocate a specific portion of the purchase price to covenants not to compete executed by the selling stockholders. Although the amount a buyer of a business pays the seller for

---

**2.** *Accord, Connery v. United States*, 460 F.2d 1130, 1134 (3d Cir. 1972); *see Amerada Hess Corp. v. Commissioner*, 517 F.2d 75, 85–86 (3d Cir. 1975). *See generally* Comment, *The Danielson Rule on the Tax Consequences of a Covenant Not to Compete*, 116 U.Pa.L.Rev. 517 (1968); [hereinafter cited as *The Danielson Rule*]; 54 Va.L.Rev. 527 (1968).

In a series of recent decisions, the Court of Claims has also expressly approved the *Danielson* rule. *E. g., Forward Communication Corp. v. United States*, 608 F.2d 485, 490 (Ct.Cl.1979); *Proulx v. United States*, 594 F.2d 832, 839 (Ct. Cl.1979); *Dakan v. United States*, 492 F.2d 1192, 1193–94 (Ct.Cl.1974).

such a covenant is ordinary income to the covenantor and an amortizable item for the covenantee, each selling stockholder nevertheless reported the entire amount received by him as proceeds from the sale of a capital asset. The Commissioner disallowed capital gains treatment to that portion of the gain corresponding to the consideration for the covenant not to compete. Upon the taxpayers' appeal from the imposition of tax deficiencies, the Tax Court ruled in favor of the taxpayers and found in effect that the covenants were neither genuinely bargained for nor realistically significant. Although the Tax Court's factual findings were accepted, we nevertheless reversed its judgment and held that the taxpayers were bound by the form and terms of their agreement as construed for federal income tax purposes by the Commissioner. In so holding, we expressly adopted the following rule of law: "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." 378 F.2d at 775.

Perhaps the most persuasive of the reasons set forth in support of this new rule was that it would alleviate problems for the Commissioner in the collection of taxes and in the administration of the tax laws. 378 F.2d at 775.[3] In the past, parties to purchase and sales agreements were encouraged to interpret the allocation of the purchase price in the way that minimized their tax liability. Since parties to such transactions were free to advocate mutually conflicting tax characterizations of their agreement, the Commissioner was frequently compelled to assess inconsistent deficiencies against parties to the same transaction in order to protect total tax revenue. Moreover, the prior law "encourage[d] parties unjustifiably to risk litigation after consummation of a transaction in order to avoid the tax consequences of their agreements."

378 F.2d at 775. As a result, the Commissioner was often confronted with the necessity for litigation against both the buyer and the seller in separate suits, in which the Commissioner took divergent positions so as to avoid two adverse judgments. By allowing the government to adopt as conclusive a result agreed to by the parties, *Danielson* provided a more efficient system that also greatly reduced the possibility of litigation, such as this case, aimed at revising the parties' bargained agreement.[4]

An additional justification for the rule adopted in *Danielson* was that allowing a party unilaterally to vary his agreement for tax purposes, absent evidence that would negate it in an action between the parties, "would be in effect to grant at the instance of a party, a unilateral reformation of the contract with a resulting unjust enrichment." 378 F.2d at 775. It is not unreasonable to expect that the parties to a transfer of a business or of property will determine the financial aspects of their transaction with reference to the tax effects engendered by the terms of the agreement. As we pointed out in *Danielson*, the presumed tax consequences of a transaction are not only "important, taxwise, both to the buyer and the seller," but also "[may] help to determine the total amount a purchaser is willing to pay for such a purchase." 378 F.2d at 775. But if one party should successfully attack an allocation, and the Commissioner then acts to protect the government's position by challenging the tax consequences claimed by the other party to the agreement, the former would be unjustly enriched at the expense of the latter who might find that he has lost a bargained-for benefit. Finally, *Danielson* also reflected our concern that permitting taxpayers to attack the form of their transaction for tax purposes "would nullify the reasonably predictable tax consequences" of purchase and sale agreements. 378 F.2d at 775. By fostering an increased predictability that the parties' contractual allocation will control the tax consequences that will

---

3. *See The* Danielson *Rule, supra* note 2, at 523–24.

4. *See The* Danielson *Rule, supra* note 2, at 523–24.

attend such agreements, the *Danielson* rule encourages parties to take such considerations into account when forming their bargain. The likely result, as one commentator of *Danielson* has noted, is an increased "probability that an allocation represents a compromise satisfactory to the opposing parties." [5]

It is not seriously disputed that the parties to the transaction at issue in this appeal, for their own reasons, structured the assignment of the lease package and the conveyance of the property on which the leased premises were to be built as sales of separate assets. Nor is there any suggestion that this agreement was infected with fraud, duress, or other fundamental error. Nevertheless, Sullivan contends that the district court's reliance on *Danielson* was misplaced and that the rule enunciated there is inapplicable to the facts of this case. Sullivan's attempt to take his transaction outside the purview of the *Danielson* rule is apparently based on two separate claims: (a) that the purported division of the purchase price between the land and the leases, unlike the transaction at issue in *Danielson*, lacked any independent basis or significance, and (b) that, again in contrast to the situation present in *Danielson*, no tax considerations possibly could have played any role in the parties' agreement to structure the transaction as they did.

A.

Sullivan's initial argument for the inapplicability of *Danielson* to the case at hand is that, unlike the allocation to the covenants to compete, the purported allocation here of the total sale proceeds between the leases and the land lacked significance. He premises this claim on the proposition that the value of a lease is an indivisible and intrinsic aspect of a fee simple interest in real estate. Normally, the right to receive rent is considered merely an incident of the total bundle of rights inherent in the ownership of a fee interest. *E. g., Koch v. Commissioner*, 71 T.C. 54, 68 (1978). Under the ordinary method in which a real estate transaction is closed, the conveyance of the fee interest is usually followed by a separate assignment of the existing leases pertaining to the property. Such assignments, however, are considered merely confirmatory of the purchaser's right to receive the rents and profits of the real estate, to which he would be entitled in any event. On this basis, Sullivan claims that the purported assignment of the lease package here was superfluous. And, because no independent basis existed either for this purported assignment of leases or for the purported allocation to the leases of a major portion of the purchase price, Sullivan argues further that he need not be precluded under *Danielson* from attacking the allocation in question, notwithstanding the form given to the transaction by the parties. In response, the government concedes that the fee simple ownership interest and the concomitant right to receive rent incident to it are not ordinarily treated as separate assets for federal income tax purposes. But, it points out, despite this custom there is no theoretical obstacle to breaking up the bundle of rights that comprise a fee simple interest in property. On the contrary, taxpayers themselves on occasion may sever the rights incident to a fee interest and, as a result, such interests may be treated separately for federal tax purposes. Indeed, it seems well-settled that leasehold interests qualify as capital assets. *See Commissioner v. Golonsky*, 200 F.2d 72 (3d Cir. 1952).

More important, however, it would appear that the transfer here of unimproved property together with the assignment of a package of agreements to lease buildings which are to be built in the future, presents a significantly different situation from the sale of improved property subject to *existing* income producing leases. When improved property subject to existing leases is conveyed, the lessee has a current right of possession and the purchaser-lessor has the immediate right to income from the use of the property. It is not unreasonable under such circumstances to conclude that the purchaser's right to receive the rents should

---

**5.** *The* Danielson *Rule, supra* note 2, at 525.

be treated as an incident of those rights stemming from his purchase of the fee simple interest. But in the situation presented by this case, the right to receive the rent contemplated under the leases is not incidental to the unimproved property transferred; the purchaser has instead a right in the future to the income provided under the leases upon construction of the premises to be leased. As the government argues, until those buildings are constructed, the leases would seem to have an independent significance and value not reflected in the land itself. Indeed, part of the independent value of the leases stems apparently from their use in obtaining financing for such construction. As Sullivan himself testified, "the ground to anyone else was valueless unless he had leases with major tenants." Given this substantial independent value of the leases to the purchaser, coupled with the fact that construction of the proposed shopping center had not yet begun at the time of the transaction in question, we reject Sullivan's contention that the allocation of a portion of the purchase price to the leases lacked any significance.

It is not necessary to resolve that question definitively, however, in order to dispose of Sullivan's argument for not applying the *Danielson* rule to this case. For our reading of that decision leaves us convinced that, regardless whether the apportionment at issue was superfluous or significant, it still forecloses Sullivan from challenging the allocation agreed to by the parties, absent proof of the type that would negate it in an action between them. *Danielson* involved an allocation to covenants not to compete rather than to an assignment of leases. But we do not perceive, nor do the parties suggest, any rationale why the general rule formulated in *Danielson* should not apply equally to either type of transaction. And in *Danielson* we expressly concluded that the taxpayers could not challenge the tax consequences of their agreement, "even though the evidence . . . would support a finding that the explicit allocation had no independent basis in fact or arguable relationship with business reality." 378 F.2d at 777. "Such evidence," we

pointed out, "can have no independent legal significance in cases where the consideration is allocated by the parties in their agreement. It would be relevant, but not conclusive, evidence only if some attack is made on the written agreement by a party claiming that because of fraud, etc., it is not his conscious agreement."

Contrary to Sullivan's contention in this case, therefore, we find that the question of the significance of the parties' allocation of a sum to the lease package is not relevant to the applicability of the *Danielson* rule.

B.

The second of Sullivan's two arguments for distinguishing this case from *Danielson* is that the rule enunciated there applies only when possible tax consequences may have been a factor in the formation of the agreement in question. Tax considerations could have played no role in the decision to divide the purchase price between the land and the leases at issue here, Sullivan argues, because the purchasers lacked any reasonable expectation of being permitted to amortize the portion of the purchase price allocated to the lease package. Thus, Sullivan concludes, the district court erred in applying the *Danielson* rule and foreclosing Sullivan from recharacterizing his agreement for federal income tax purposes. We do not agree with either of the premises of Sullivan's argument, or with the conclusion that he seeks to draw from them.

In the first place, it is not at all clear that tax considerations could not have played a role in the parties' decision to allocate the purchase price between the land and the leases. To the contrary, the district court made a finding of fact that the purchasers might amortize the amount allocated to the leases or "utilize [it] for other tax treatment which might be of tax benefit to them." Sullivan responds that the purchasers could have had no reasonable expectation of being allowed to amortize any portion of the purchase price, inasmuch as the I.R.S. has consistently taken the position that the owner of a fee interest in property which is subject to an existing lease may

not amortize the value of the lease. But as we have already pointed out, that type of interest is significantly different from the package of agreements to lease buildings that are to be constructed in the future— the factual situation applicable here. In view of the substantial independent value of these lease agreements, it would not have been unreasonable for the purchasers to have at least hoped for favored tax treatment. Since the tax status of the purchasers is not at issue in this appeal, there is nothing in the record to indicate that they did not report their income in accordance with the form of the parties' agreement. Moreover, Hyman testified at trial that the leases were being amortized and that the allocation therefore would have tax consequences for the purchasers. And Sullivan offered no evidence at trial to show that the purchasers did not gain a tax benefit from this allocation. Finally, Sullivan himself apparently concedes that if the I.R.S. had allowed his election of installment sale treatment, he would have in fact benefitted from reporting the transaction in accordance with the allocation. We are thus inclined to believe that presumed tax consequences may well have been a factor in the allocation of the purchase price between the land and leases.

Even if we assume, *arguendo*, that tax considerations could not have played any role in the formation of the parties' agreement here, however, that fact alone would not appear to justify excluding this case from the scope of *Danielson*. On the contrary, the *Danielson* rule appears on its face to apply generally and without limitation to cases in which a party attempts to challenge the tax consequences of his own agreement.

The only authority Sullivan offers in support of his contrary reading of *Danielson* is *Amerada Hess Corp. v. Commissioner*, 517 F.2d 75 (3d Cir. 1975). The question in that case concerned the proper value of shares of actively traded stock that was exchanged in return for certain corporate assets. The agreement between the parties assigned a value to the stock that was substantially higher than its fair market value. We disregarded the value assigned to the stock in the agreement and adopted the market value instead, and thus concluded that the rationale underlying *Danielson* was not germane to the facts of that case. But the justification for distinguishing *Amerada Hess* from the *Danielson* situation was not, as Sullivan argues, that the value assigned to the shares of stock lacked independent tax significance; it was, rather, that both parties to the transaction in *Amerada Hess* were before the Court and that the Commissioner himself was attacking the terms of the agreement together with one of the parties.

■ As we noted in *Amerada Hess, Danielson* explicitly distinguished the situation in which the Commissioner is attacking the transaction in the form selected by the parties from the situation present here, in which the Commissioner is instead attempting to hold a party to his own agreement. When the Commissioner attacks a formal agreement, the court "is required to examine the 'substance' and not merely the 'form' of the [agreement] . . . for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction." *Commissioner v. Danielson*, 378 F.2d at 774, *quoted in Amerada Hess Corp. v. Commissioner*, 517 F.2d at 86 n. 38. But "to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make." *Commissioner v. Danielson*, 378 F.2d at 775; *quoted in Amerada Hess Corp. v. Commissioner*, 517 F.2d at 86 n. 38.

There is nothing sinister in arranging one's affairs so as to minimize taxes.[6] It

---

6. "[O]ver and over again courts have said that there is nothing sinister in so arranging one's affairs as to keep taxes as low as possible.

Everybody does so, rich or poor; and all do right, for nobody owes any public duty to pay more than the law demands: taxes are en-

would be unfair, of course, to assess taxes on the basis of an agreement the taxpayers did not make. But once parties "enter into an agreement with a clear understanding of its substance and content, they cannot. be heard to say later that they overlooked possible tax consequences." *Commissioner v. Danielson,* 378 F.2d at 778, (quoting *Hamlin's Trust v. Commissioner,* 209 F.2d 761, 765 (10th Cir. 1954)); *accord, Balthrope v. Commissioner,* 356 F.2d 28, 34 (5th Cir. 1966). The failure to recognize and appreciate certain tax consequences is simply not a reason for disregarding an agreement, for the effectiveness taxwise of an agreement is not measured by the level of the parties' awareness respecting it. "It is enough if parties understand the contract and understandingly enter into it." *Commissioner v. Danielson,* 378 F.2d at 778, (quoting *Hamlin's Trust v. Commissioner,* 209 F.2d at 765). In this case, there is no suggestion that Sullivan did not consciously and knowingly accept and agree to allocate the purchase price between the land and the package of leases. Having thus agreed, Sullivan is "not at liberty to say that such was not the substance and reality of the transaction." *Id.*

Accordingly, we find no error in the district court's judgment upholding the Commissioner's determination that the land and the package of leases constituted separate capital assets for purposes of the federal income tax law.

### III.

Our decision respecting the Commissioner's treatment of the land and the package of leases as separate assets makes it necessary for us to address Sullivan's alternative claim that the district court erred in upholding the I.R.S.'s further determination that 35 percent of the gain recognized on the sale of the leases was attributable to leases held by Sullivan for less than six months.

At the time in question, the Internal Revenue Code provided that gain from the sale of capital assets held for less than six months was subject to taxation at ordinary income rates, while gain derived from the sale of assets held for more than six months was taxable at lower capital gain rates.[7] Accordingly, the I.R.S. determined that of the $1,250,000 recognized on the sale of the lease package, only the gain allocable to those leases executed more than six months prior to the sale could be accorded long-term capital gain treatment. Purporting to follow the method employed by the purchaser in determining the purchase price, the I.R.S. determined that approximately 35 percent of the amount allocated to the lease package was attributable to leases executed within six months of the assignment, and thus were subject to short-term rather than long-term capital gain treatment.

Tax determinations by the Commissioner are entitled to a presumption of correctness. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Demkowicz v. Commissioner,* 551 F.2d 929, 931 (3d Cir. 1977). Moreover, the taxpayer bears the ultimate burden of proving, by a preponderance of the evidence, that a particular assessment is erroneous. *Helvering v. Taylor,* 293 U.S. at 515, 55 S.Ct. at 290; *Demkowicz v. Commissioner,* 551 F.2d at 931; *Psaty v. United States,* 442 F.2d 1154, 1158 (3d Cir. 1971); *Baird v. Commissioner,* 438 F.2d 490, 492 (3d Cir. 1971). Although the presumption of correctness is overcome and the procedural burden of going forward with the evidence is shifted once the taxpayer presents "competent and relevant credible evidence" sufficient to establish that the Commissioner's determination is erroneous, the ultimate burden of proof or persuasion remains at all times with the taxpayer. *Demkowicz v. Commissioner,* 551 F.2d at 931; *Baird v. Commissioner,* 438 F.2d at 493. Neverthe-

---

forced exactions, not voluntary contributions. To demand more in the name of morals is mere cant." *Commissioner v. Newman,* 159 F.2d 848, 850 (2d Cir., 1947) (L. Hand, J., dissenting).

7. Int.Rev.Code of 1954, Ch. 736, 68A Stat. 322 (now I.R.C. § 1222).

less, as we held in *Demkowicz*, when the Commissioner does not offer any evidence to support a deficiency assessment, uncontroverted evidence that the Commissioner's determination is incorrect will be sufficient to meet the taxpayer's ultimate burden unless such evidence is specifically rejected by the finder of fact as being "improbable, unreasonable or questionable." 551 F.2d at 931.

At trial, Sullivan offered evidence that purported to establish that the leases executed within six months of the assignment of the lease package were of little or no value, and that the government's computation that approximately 35 percent of the total value of the lease package should be allocated to those leases was therefore erroneous. The district court rejected Sullivan's argument in this regard, and expressly found that Sullivan had not met his burden of proving that the Commissioner's assessment was incorrect. Relying on our decision in *Demkowicz*, Sullivan now contends that inasmuch as the district court did not specifically find that any of the evidence presented by the taxpayer was "improbable, unreasonable or questionable," it erred in holding that Sullivan had not borne his ultimate burden of proof.

Sullivan's reliance on *Demkowicz*, however, is misplaced. In that case, we held that the taxpayer's evidence establishing the incorrectness of the Commissioner's determination was sufficient to meet his burden of proof, unless rejected as improbable, unreasonable or questionable, precisely because the Commissioner failed to offer any contrary evidence to support the deficiency assessment. 551 F.2d at 931 and nn. 5 & 6. But the evidence in this case is not uncontroverted. On the contrary, the government offered proof at trial that the purchaser's own formula for ascertaining the value of the lease package placed a value on each lease in the package roughly equal to ten percent of the total rent expected to be received over the life of each lease. On the basis of this conflicting evidence, the district court specifically held, "[i]n view of doubts [in the record] as to the

values of the separate leases," that Sullivan had not met his burden of showing the incorrectness of the Commissioner's determination. We hold, on the basis of our review of the record, that the district court did not err in this respect.

IV.

Because we find that the district court did not err either in upholding the Commissioner's treatment of the land and the lease package as separate capital assets or in concluding that Sullivan had not met his burden of showing that the deficiency determination of the I.R.S. was erroneous, its judgment will be affirmed.