**UNITED STATES of America, Plaintiff,**

v.

**Gary A. DAUM and Linda M. Daum, Defendants.**

**Civil Action No. 95–634.**

United States District Court, W.D. Pennsylvania.

April 30, 1997.

D. Is otherwise in competition with the said National Telephone Directory Company. Agreement, ¶ 8 (emphasis added).

Amy R. Hay, Asst. U.S. Atty., Pittsburgh, PA, Angelo A. Frattarelli, Trial Atty., Tax Division, U.S. Dept. of Justice, Washington, DC, for Plaintiff.

Thomas D. Arbogast, Thomas M. Hardiman, Titus & McConomy, Pittsburgh, PA, for Defendants.

## MEMORANDUM

STANDISH, District Judge.

### I

In this civil action, the plaintiff, United States of America, seeks to recover, pursuant to Section 7405(b) of the Internal Revenue Code, 26 U.S.C. § 7405(b), an alleged erroneous tax refund paid to the defendants, Gary A. Daum and Linda M. Daum, for the tax year 1988. Presently, before the court is the United States' motion for partial summary judgment pursuant to Fed.R.Civ.P. 56. After consideration, and for the reasons set forth below, the motion will be granted.

### II

The following facts are undisputed:

Mr. Daum was employed by General Nutrition, Inc. (GNC) from 1962 until May, 1985. He served as GNC's President and Chief Operating Officer from 1979 until February, 1984. At that time, Mr. Daum was promoted to Chief Executive Officer of GNC, and he served in that capacity until May 13, 1985. (Original Motion for Summary Judgment, Exh. 1a, ¶¶ 1–3, Exh. 1b, ¶ 1).[1]

---

1. The government filed its first motion for summary judgment in this case on October 30, 1995. The motion was denied without prejudice by order dated April 10, 1996. In its present motion, the government incorporates by reference the three exhibits that were attached to its original motion for summary judgment.

David B. Shakarian was the founder and controlling shareholder of GNC from its inception until his death on September 11, 1984.[2] David H. Lucas was the son-in-law of Mr. Shakarian, and he served on the Board of Directors of GNC. After Mr. Shakarian's death, Mr. Lucas gained control of GNC by virtue of a delegation of authority from the estate of Mr. Shakarian. (Original Motion for Summary Judgment, Exh. 1a, ¶¶ 4–6, Exh. 1b, 1).

In March, 1985, Mr. Daum filed a lawsuit against Mr. Shakarian's estate in Florida, seeking to enforce a promise allegedly made by Mr. Shakarian prior to his death to bequeath five percent of GNC's stock to Mr. Daum. Shortly thereafter, on May 13, 1985, Mr. Daum was fired as the President and Chief Executive Officer of GNC. (Original Motion for Summary Judgment, Exh. 1a, ¶¶ 7–8, Exh. 1b, ¶ 1). As a result of his firing, Mr. Daum filed suit in the Court of Common Pleas of Allegheny County, Pennsylvania against GNC and Mr. Lucas, alleging claims for wrongful discharge, defamation, breach of contract and tortious interference with contract.

On September 12, 1988, Mr. Daum settled his lawsuit against GNC and Mr. Lucas. The settlement agreement provides in relevant part:

\*　　\*　　\*　　\*　　\*　　\*

2. In consideration for the settlement and discontinuance with prejudice of the lawsuit, GNC will pay Daum, on or before September 26, 1988, the sum of Six Hundred Seventy–Five Thousand Dollars ($675,000), which sum will be allocated as follows:

- $150,000 payable to Eckert Seamans Cherin &
- Mellott for counsel fees $300,000 for alleged personal injury losses, including specifically pain and suffering
- $225,000 for alleged lost salary and benefits.

Daum shall be responsible for all federal, state or local taxes payable with respect to the foregoing amounts, and shall indemnify GNC from any liability for failure to withhold federal, state or local taxes in connection with such payments.

3. GNC agrees to purchase 475,730 shares of its common stock now owned by Gary Daum and/or Gary Daum and Linda Daum for the price of 5⅜ dollars per share, which purchase will occur and the consideration paid on or before September 25, 1988, provided that certificates evidencing such shares are available for inspection by GNC on or before September 23, 1988.

(Original Motion for Summary Judgment, Exh. 1 to Exh. 1a).

Pursuant to paragraph 3 of the settlement agreement, the defendants realized $2,557,048.70 on account of their GNC stock in 1988.[3] (Original Motion for Summary Judgment, Exh. 1a, ¶¶ 9–12, Exh. 1b, ¶¶ 1–12). In their original federal income tax return for 1988, which was filed on or about October 16, 1989, the defendants claimed a basis of $327,994.00 in the 475,730 shares of GNC stock sold pursuant to paragraph 3 of the settlement agreement, resulting in a long term capital gain of $2,229,055.00.[4] (Original Mo-

---

2. Paragraph 4 of Exhibit 1a to the United States' original motion for summary judgment states that Mr. Shakarian died on September 11, 1985. However, on June 16, 1996, the United States moved to correct the record, noting, *inter alia*, that, in fact, Mr. Shakarian died on September 11, 1984. The motion was granted on June 28, 1996. (Docket No. 36).

3. With respect to paragraph 3 of the settlement agreement, the defendants admitted in response to the United States' Requests for Admission that GNC agreed to purchase 475,730 shares of restricted and unregistered GNC stock from Mr. Daum on or before September 25, 1988 for $5⅜ per share. However, the defendants denied that the shares were worth $5⅜ per share. Rather, because of their restricted and unregistered nature, the defendants maintain that Mr. Daum's shares were worth substantially less than $5⅜ each and that the premium paid by GNC for Mr. Daum's shares was to compensate Mr. Daum, in part, for the personal injuries he suffered because of his wrongful discharge and defamation. (Original Motion for Summary Judgment, Exh. 1b).

4. The defendants' long term capital gain resulting from the sale of their GNC stock pursuant to the terms of the settlement agreement was computed as follows:

| | |
|---|---|
| $2,557,048.70 | Sales price agreement per settlement |

tion for Summary Judgment, Exh. 1a, ¶ 14, Exh. 1b, ¶ 14). Initially, the defendants reported a total tax liability of $579,036.00 for 1988, which they paid in full. (Original Motion for Summary Judgment, Exh. 3, line 10). Subsequently, in an amended return for the 1988 tax year, the defendants reported a total tax liability of $544,044.00.[5] (Original Motion for Summary Judgment, Exh. 2, lines 53–65).

On or about October 15, 1992, the defendants filed a second amended federal income tax return for 1988, claiming a refund in the amount of $278,561.00 for that year. (Complaint, ¶ 9, Exh. 1). The defendants' claim for a refund in their second amended federal income tax return for 1988 was based on the reduction of the defendants' taxable income by $975,351.00 due to the reduction of long term capital gain from $2,229,055.00 to $1,253,704.00 from the sale of the GNC stock pursuant to paragraph 3 of the settlement agreement. The defendants explained the change in their taxable income for 1988 as follows: "Taxpayer erroneously included personal injury proceeds of settlement award on Schedule D as sales proceeds received in connection with the redemption of 475,730 shares of defendant GNC's common stock." [6] (Complaint, ¶ 9, Exh. 1).

On or about May 3, 1993, the Internal Revenue Service refunded to the defendants the sum of $379,636.61, representing tax ($278,561.00), penalty ($1,582.48) and interest ($1,270.64) abatements with respect to the 1988 tax year, plus statutory interest of $98,-222.49. (Complaint, Exhs. 2 and 3, Original Motion for Summary Judgment, Exh. 3, p. 2, lines 2–7). Thereafter, on March 3, 1995, the Internal Revenue Service sent the following letter to the defendants:

Dear Mr. and Mrs. Daum:

The refund check which we mailed to you on or about May 3, 1993, for your alleged 1988 overpayment was incorrect. This erroneous refund of $379,636.61 was due to

the Form 1040X, Amended U.S. Individual Income Tax Return, which you filed on or after October 15, 1992.

You reported $2,229,055 in gain on the redemption of 475,730 shares of GNC stock on your original 1988 federal income tax return. On the Form 1040X which you filed on or after October 15, 1992, you reported that $975,351 of that gain was actually nontaxable personal injury damages. You also claimed a refund for the amount of tax, interest, and penalties previously assessed with respect to the gain. A review of your account shows that the total amount of tax, interest, and penalties were abated, and a refund check in the amount of $379,636.61 (which includes $98,-222.49 in interest on the alleged overpayment) was erroneously issued to you on or about May 3, 1993.

The government's position is that the $975,351 which you claimed as nontaxable personal injury damages is actually taxable gain on the redemption of the shares of GNC stock. Therefore, the refund check in the amount of $379,636.61 was erroneously refunded to you.

In order to resolve this matter, we are requesting that you make voluntary repayment of the $379,636.61 plus interest (May 3, 1993 through March 13, 1995) of $57,-797.11 for a total of $437,433.72. Internal Revenue Code Section 7405 provides that the United States may bring a civil action to recover erroneous refunds. We have enclosed a return envelope for your convenience.

\*    \*    \*    \*    \*    \*

(Complaint, Exh. 4, Answer, ¶ 11).

The defendants have refused to repay the monies refunded to them with respect to the 1988 tax year. (Answer, ¶ 12).

On August 22, 1991, GNC filed an amended federal corporate income tax return for the tax year ended February 4, 1989 to

---

|  – 327,994.00 | Basis |
| $2,229,054.70 | Gain on sale |

**5.** The defendants' first amended federal income tax return for 1988 resulted in a refund of $44,-549.67, and that refund is not at issue. (Memorandum of Law in Support, p. 2).

**6.** Section 104(a)(2) of the Internal Revenue Code excludes damages received on account of personal injury from taxable income. (Memorandum of Law in Support, p. 3).

change its claimed deductions. In the amended return, GNC explained the changes to its deductions for the tax year ending February 4, 1989 as follows: "The taxpayer is increasing total deductions for a payment made to a former officer of the company in settlement of his legal claims for lost wages based upon his termination from employment. The amount of the deduction is $958,-894 which was paid on September 12, 1988." (Renewed Motion for Summary Judgment, Stevenson Declaration, Exh. 1).[7]

On May 15, 1995, a Revenue Agent's report was issued, disallowing the $958,894.00 deduction claimed by GNC as a non-deductible payment for the stock GNC purchased pursuant to its settlement agreement with Mr. Daum. GNC did not contest the disallowance of the deduction.[8] (Renewed Motion for Summary Judgment, Stevenson Declaration, ¶ 5, Exh. 2).

## III

Rule 56(c) of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212 (1986). The existence of a factual dispute between the parties will defeat an otherwise properly supported motion for summary judgment only if there is a "genuine" issue of "material" fact. *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510, 91 L.Ed.2d at 211. Keeping this standard in mind, the court turns to the United States' motion for partial summary judgment.

## IV

Section 7405(b) of the Internal Revenue Code provides:

**§ 7405. Action for recovery of erroneous refunds**

\*   \*   \*   \*   \*   \*

**(b) Refunds otherwise erroneous.—** Any portion of a tax imposed by this title which has been erroneously refunded (if such refund would not be considered as erroneous under section 6514) may be recovered by civil action brought in the name of the United States.

\*   \*   \*   \*   \*   \*

26 U.S.C. § 7405(b).

To prevail in an action to recover an erroneous refund brought pursuant to Section 7405(b), the government must establish (1) that a refund was paid to the taxpayers; (2) the amount of the refund; (3) that the government's recovery action was timely; and

---

**7.** On May 2, 1996, the United States renewed its motion for summary judgment in this case, and, by order dated June 20, 1996, the renewed motion was denied without prejudice. In the present motion, the government incorporates by reference the Declaration of Mark Stevenson, together with its exhibits, which was attached to the government's renewed motion for summary judgment. Mr. Stevenson is the Revenue Agent who reviewed GNC's amended federal corporate income tax return for the tax year ended February 4, 1989.

**8.** The disallowance of this claimed deduction by GNC for the tax year ending February 4, 1989 arose during an audit of GNC's federal corporate income tax return for the tax year ended February 3, 1990. (Renewed Motion for Summary Judgment, Stevenson Declaration). In this regard, the defendants note that significant tax issues had been raised in the audit of GNC, including GNC's claim for deductions of $70 million to $80 million arising out of expenses incurred during the leveraged buy-out of GNC. The defendants have offered evidence to show that GNC did not contest the disallowance of the claimed deduction for a portion of the payment to Mr. Daum under paragraph 3 of the settlement agreement because it was " 'de minimis' in comparison to the favorable treatment GNC received on the crucial issue of the [leveraged buy-out] deductions." (Brief in Opposition, p. 6 n. 2). The court, however, fails to see the significance of the reason for GNC's failure to contest the disallowance of the claimed deduction for a portion of the payment to Mr. Daum under paragraph 3 of the settlement agreement in relation to the issue raised by the government's motion for partial summary judgment.

(4) that the taxpayers were not entitled to the refund which the government seeks to recover. *See, e.g., United States v, Commercial Nat'l Bank of Peoria,* 874 F.2d 1165, 1169 (7th Cir.1989). In the present case, the fact that a refund was made to the defendants and the amount of that refund are not disputed. There is also no dispute that the government's suit is timely. Therefore, the only issue is whether the defendants are entitled to the refund which the government seeks to recover.

With respect to the defendants' entitlement to the refund at issue, the United States asserts that the refund was erroneous because the defendants' reallocation of the proceeds realized on account of the sale of their GNC stock in their second amended income tax return for 1988 is directly contrary to paragraph 3 of the settlement agreement between Mr. Daum, GNC and Mr. Lucas, and that this reallocation violates the rule enunciated by the United States Court of Appeals for the Third Circuit in *Commissioner v. Danielson,* 378 F.2d 771 (3d Cir.) (*en banc*), *cert. denied,* 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967). Therefore, the government maintains that the defendants are not entitled to the refund that was issued pursuant to their second amended federal income tax return for the 1988 tax year.

In response, the defendants do not dispute the vitality or the controlling nature of the *Danielson* decision within the Third Circuit. Rather, the defendants contend that the so-called *"Danielson rule"* does not apply to the facts of this case because the rationale underlying that decision is not present here; that, even if the *Danielson* rule applies, the government's motion should be denied because it admitted in parallel litigation in the United States Tax Court that a portion of the consideration received by Mr. Daum pursuant to paragraph 3 of the settlement agreement was for Mr. Daum's agreement to terminate his lawsuit against GNC and Mr. Lucas; and that the government has not satisfied its burden of proving that the refund at issue was erroneous. After consideration, the court finds the defendants' arguments unpersuasive.

In *Danielson,* the taxpayers were stockholders in the Butler County Loan Company (Loan), who had decided to solicit offers for the purchase of the company. Thrift Investment Corporation (Thrift) offered, in writing, to buy all the common stock of Loan for $374.00 per share and "our usual non-compete agreement in the Butler area." The stock purchase agreement allocated $152.00 per share as the price for the seller's covenant not to compete and $222.00 per share as the price for the stock.

Each taxpayer reported the entire amount received from Thrift as proceeds from the sale of capital assets, and the Commissioner disallowed that portion which corresponded to the consideration recited in the covenant not to compete and issued a notice of deficiency. The taxpayers petitioned for a redetermination of the deficiency, and the Tax Court ruled in their favor, permitting the consideration allocated to the covenant not to compete to be taxed at: capital gains rates, rather than as ordinary income. The Tax Court found that the taxpayers had produced strong proof that the covenant not to compete was not realistically bargained for by the parties and that the amounts allocated thereto by Thrift were, in reality, that part of the purchase price of the stock which represented a premium on corporate receivables.

Thereafter, the Commissioner filed petitions for review, arguing that where the parties to a transaction involving the sale of a business have entered into a written agreement spelling out the precise amount to be paid for a covenant not to compete, they should not be permitted, for tax purposes, to attack such provision except in cases of fraud, duress or undue influence. In response to this argument, the taxpayers asserted that such an approach would dignify form over substance and that the substance of the transaction at issue, as found by the Tax Court, showed that the amounts allocated in the agreement for the covenant not to compete had no independent basis in fact or arguable relationship with business reality.

After considering the "soundness of the rule contended for by the Commissioner," the Third Circuit, sitting *en banc*, vacated the decision of the Tax Court. In so doing,

the Third Circuit enunciated the *Danielson* rule, which provides that "a party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence, fraud, duress, etc." 378 F.2d at 775.[9]

One of the factors underlying the Third Circuit's decision in *Danielson* was the potential for the Commissioner to be "whipsawed," which the defendants aptly describe as a situation *in* which both parties to a taxable event avoid taxation by taking inconsistent tax reporting positions for the same transaction. (Brief in Opposition, p. 11). This potential in *Danielson* resulted from the fact that Thrift had taken a tax deduction by allocating $152.00 per share to the covenant not to compete, while Loan's shareholders attempted to avoid the allocation of $152.00 per share to the covenant not to compete by reporting this payment as part of the sale proceeds of the stock. As noted by the defendants, if the Third Circuit had upheld the Tax Court's ruling, the parties would have "whipsawed" the Commissioner because Thrift would have been allowed to take a tax deduction of $152.00 per share, while Loan's shareholders would have received capital gains treatment for the same payment. Such an inconsistency clearly works to the detriment of the Internal Revenue Service. (Brief in Opposition, p. 12).

Another factor underlying the Third Circuit's decision in *Danielson* was the possible unjust enrichment of Loan's shareholders. Specifically, the Third Circuit stated that "to permit a party to an agreement fixing an explicit amount for the covenant not to compete to attack that provision for tax purposes, absent proof of the type which would negate it in an action between the parties, would be in effect to grant a unilateral reformation of the contract with a resulting unjust enrichment." *Id.* at 775. Thrift would have been forced to defend the agreement in order to amortize the amount allocated to the covenant not to compete, and, if unsuccessful, Thrift would lose a tax advantage it had presumably paid Loan's shareholders to acquire.

With respect to their first argument in opposition to the government's motion for partial summary judgment, the defendants contend that, because there was never any potential for the Commissioner to be "whipsawed" in this case based on the fact that the defendants and GNC reported the tax consequences of paragraph 3 of the settlement agreement in a consistent manner, and because there was no unilateral attempt by the defendants to reform the settlement agreement with a resulting unjust enrichment to the detriment of GNC, the *Danielson* rule is not applicable in this case.[10] In support of this argument, the defendants cite several cases in which courts have declined to apply the *Danielson* rule because "the rationale underlying it was not germane to the facts of the case." (Brief in Opposition, p. 12). Turning first to the defendants' reliance on the decision of the Third Circuit in *Amerada Hess Corp. v. Comm'r of Internal Revenue*, 517 F.2d 75 (3d Cir.), *cert. denied*, 423 U.S. 1037, 96 S.Ct. 574, 46 L.Ed.2d 412 (1975), the court concludes that such reliance is mis-

---

9. Although the provision of the stock purchase agreement at issue in *Danielson* was a covenant not to compete, the defendants do not dispute that the *Danielson* rule has been applied in cases that do not involve non-compete agreements. (Brief in Opposition, p. 11).

10. It is interesting to *note* in this regard that the defendants and GNC initially reported the tax consequences of paragraph 3 of the settlement agreement in a consistent manner and in accordance with the Commissioner's position in this case. Then, on August 22, 1991, GNC filed an amended federal corporate income tax return for the tax year ending February 4, 1989 seeking to deduct $958,894.00 of the amount paid to Mr.

Daum pursuant to paragraph 3 of the settlement agreement as "a payment made to a former officer of the company in settlement of his legal claims for lost wages based upon his termination of employment," and, on October 15, 1992, the defendants filed a second amended federal income tax return for 1988 seeking to reduce the amount of long term capital gain realized as a result of the redemption of their shares of GNC stock pursuant to paragraph 3 of the settlement agreement based on the assertion that they had erroneously included personal injury proceeds of $975,351.00 in the amount of stock sale proceeds.

placed. In a subsequent decision, the Third Circuit noted that the justification for distinguishing *Amerada Hess* from the situation presented in *Danielson* was the fact that both parties to the transaction in *Amerada Hess* were before the court and the fact that the Commissioner himself was attacking the terms of the agreement together with one of the parties.[11] Specifically, in *Sullivan v. United States,* 618 F.2d 1001 (3d Cir.1980), the Third Circuit stated:[12]

\*    \*    \*    \*    \*    \*

> Even if we assume, arguendo, that tax considerations could not have played any role in the formation of the parties' agreement here, however, that fact alone would not appear to justify excluding this case from the scope of *Danielson.* On the contrary, the *Danielson* rule appears on its face to apply generally and without limitation to cases in which a party attempts to challenge the tax consequences of his own agreement.

> The only authority Sullivan offers in support of his contrary reading of *Danielson* is *Amerada Hess Corp. v. Commissioner,* 517 F.2d 75 (3d Cir.1975). The question in that case concerned the proper value of shares of actively traded stock that was exchanged in return for certain corporate assets. The agreement between the parties assigned a value to the stock that was substantially higher than its fair market value. We disregarded the value assigned to the stock in the agreement and adopted the market value instead, and thus concluded that the rationale underlying *Danielson* was not germane to the facts of that case. But the justification for distinguishing *Amerada Hess* from the *Danielson* situation was not, as Sullivan argues, that the value assigned to the shares of stock lacked independent tax significance;

it was, rather, that both parties to the transaction in *Amerada Hess* were before the Court and that the Commissioner himself was attacking the terms of the agreement together with one of the parties.

> As we noted in *Amerada Hess, Danielson* explicitly distinguished the situation in which the Commissioner is attacking the transaction in the form selected by the parties from the situation presented here, in which the Commissioner is instead attempting to hold a party to his own agreement. When the Commissioner attacks a formal agreement, the court "is required to examine the 'substance' and not merely the 'form' of the (agreement) ... for the very good reason that the legitimate operation of the tax laws is not to be frustrated by forced adherence to the mere form in which the parties may choose to reflect their transaction." *Commissioner v. Danielson,* 378 F.2d at 774, quoted in *Amerada Hess Corp. v. Commissioner,* 517 F.2d at 86 n. 38. But "to allow the Commissioner alone to pierce formal arrangements does not involve any disparity of treatment because taxpayers have it within their own control to choose in the first place whatever arrangements they care to make." *Commissioner v. Danielson,* 378 F.2d at 775; quoted in *Amerada Hess Corp. v. Commissioner,* 517 F.2d at 86 n. 38.

> There is nothing sinister in arranging one's affairs so as to minimize taxes. It would be unfair, of course, to assess taxes on the basis of an agreement the taxpayers did not make. But once parties "enter into an agreement with a clear understanding of its substance and content, they cannot be heard to say later that they overlooked possible tax consequences." *Commissioner v. Danielson,* 378 F.2d at 778, (quoting *Hamlin's Trust v. Commissioner,* 209 F.2d 761, 765 (10th Cir.1954); accord, *Balthrope*

---

**11.** The complex agreement at issue in *Amerada Hess* arose out of a corporate acquisition in which the seller was given stock by the purchaser in exchange for corporate assets.

**12.** In *Sullivan,* the taxpayers sought a refund of federal income taxes paid on income realized from the sale of unimproved real estate and the contemporaneous yet separate assignment of a package of agreements to lease premises to be developed on that land. The district court en-

tered judgment for the government, and the taxpayers appealed. The Third Circuit held, *inter alia,* that the taxpayers, who sold undeveloped land and leases to premises to be constructed on such land pursuant to a contract allocating certain percentages of the purchase price to the land and the leases, were bound by such allocation for federal income tax purposes. 618 F.2d at 1008.

*v. Commissioner,* 356 F.2d 28, 34 (5th Cir.1966)). The failure to recognize and appreciate certain tax consequences is simply not a reason for disregarding an agreement, for the effectiveness taxwise of an agreement is not measured by the level of the parties' awareness respecting it.

"It is enough if parties understand the contract and understandingly enter into it." *Commissioner v. Danielson,* 378 F.2d at 778, (quoting *Hamlin's Trust v. Commissioner,* 209 F.2d at 765). In this case, there is no suggestion that Sullivan did not consciously and knowingly accept and agree to allocate the purchase price between the land and the package of leases. Having thus agreed, Sullivan is "not at liberty to say that such was not the substance and reality of the transaction." *Id.*

\* \* \* \* \* \*

618 F.2d at 1007–08.

Similarly, in the present case, the government is not attacking the settlement agreement in the form selected by Mr. Daum, GNC and Mr. Lucas. Rather, it is attempting to hold Mr. Daum to his own agreement. There is no indication that Mr. Daum "did not consciously and knowingly accept and agree to allocate" the agreed upon settlement amount as set forth in paragraphs 2 and 3 of the settlement agreement,[13] and his "failure to recognize and appreciate certain tax consequences is simply not a reason for disregarding [the] agreement." Under the circumstances, the court concludes that the decision of the Third Circuit in *Amerada Hess* does not support the defendants' argument that the *Danielson* rule is not applicable in this case.

As to the defendants' reliance on the decisions of the United States Court of Claims in *Dakan v. United States,* 203 Ct.Cl. 655, 492 F.2d 1192 (1974), *Proulx v. United States,* 219 Ct.Cl. 363, 594 F.2d 832 (1979) and *Campbell v. United States,* 228 Ct.Cl. 661, 661 F.2d 209 (1981), the court agrees

with the defendants that these decisions appear to indicate that the potential for the Commissioner to be "whipsawed" must exist for the *Danielson* rule to apply. However, to the extent that these decisions are based on such a holding, the court declines to follow them. Rather, the court is persuaded that the existence of the potential for the Commissioner to be "whipsawed" is unnecessary based on the language of the Third Circuit in *Sullivan* that "the *Danielson* rule on its face appears to apply generally and without limitation to cases in which a party attempts to challenge the tax consequences of his own agreement." Clearly, another important factor underlying the Third Circuit's decision in *Danielson,* which the defendants do not acknowledge in their response to the United States' motion for partial summary judgment, is the "the considerable problems in the collection of taxes" which would result if challenges, such as the one made by the defendants in this case, were permitted. *Danielson,* 378 F.2d at 775.

The decision of the United States Court of Appeals for the Sixth Circuit in *North American Rayon Corp. v. Comm'r of Internal Revenue,* 12 F.3d 583 (6th Cir.1993), supports the court's conclusion that the *Danielson* rule is applicable in this case. In *North American Rayon,* the taxpayer had appealed from a decision of the United States Tax Court, determining deficiencies in the income tax due from the taxpayer. The Sixth Circuit held that, for purposes of determining the taxpayer's basis for depreciation of assets purchased under an asset sale agreement, the taxpayer was bound by the unambiguous allocation of the purchase price set forth in the agreement, absent a showing of undue influence rendering the allocation unenforceable. The Sixth Circuit stated in relevant part:

\* \* \* \* \* \*

The *Danielson* rule serves the purpose of increasing the level of certainty as to

---

**13.** This conclusion is buttressed by the fact that Mr. Daum was represented by John J. Meyers, Esquire in his lawsuit against GNC and Mr. Lucas. During his deposition, Mr. Meyers testified that he proposed the allocation of the settlement proceeds set forth in the settlement agreement, and that, although he is not a tax attorney, he took into consideration the tax consequences of the agreement during negotiations. (Motion for Partial Summary Judgment, Exh. 4, pp. 43–44).

the tax consequences of contracts. By allowing the Commissioner to determine tax consequences from the form of a taxpayer's contract, the *Danielson* rule alleviates the litigation burden of the Commissioner. If a party could alter the express terms of his contract by arguing that the terms did not represent economic. reality, the Commissioner would be required to litigate the underlying factual circumstances of "countless" agreements.[14] Furthermore, the Commissioner might be required to litigate against both parties to the agreement in order to protect tax revenues. *Schatten [v. United States]*, 746 F.2d [319] at 322 [(6th Cir.1984)]; *Danielson*, 378 F.2d at 775. If both parties succeeded in their claims, the Commissioner would lose out on revenue that logically should have come from one of the parties. *Sullivan v. United States*, 618 F.2d 1001, 1004 (3d Cir. 1980). In those situations, the Commissioner is commonly referred to as being "whipsawed." By allowing the Commissioner to hold taxpayers to the terms of their agreements, the *Danielson* rule prevents this "whipsaw" problem. *Spector v. Commissioner*, 641 F.2d 376, 385 (5th Cir. Unit A. Apr.), *cert. denied*, 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981).

Not only does the *Danielson* rule provide certainty to the Commissioner, it also provides a higher level of certainty to the taxpayers by maintaining "the reasonably predictable tax consequences" of agreements. *Danielson*, 378 F.2d at 775. If the other party cannot rely on the agreement to predict tax consequences, then the

making of such agreements will be hindered. *Schatten*, 746 F.2d at 322. "By fostering an increased predictability that the parties' contractual allocation will control the tax consequences that will attend such agreements, the *Danielson* rule encourages parties to take such considerations into account when forming their bargain." *Sullivan*, 618 F.2d at 1004–05. Of course, the taxpayers cannot rely merely on the form of their transaction to predict tax consequences. The Commissioner is not bound by the form and can look through the form of a taxpayer's transaction to its substance in determining the proper effect for taxation. *E.g., Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). The *Danielson* rule does, however, increase the predictability of tax results by preventing one party to an agreement from unilaterally reforming the agreement for tax purposes.

Petitioner argues that allowing it to reallocate the purchase price in conformity with economic reality would not violate the purposes of the *Danielson* rule, because there is no possibility of the Commissioner's being whipsawed, and therefore the *Danielson* rule should not be applied to this case. Petitioner contends that Beaunit and its subsidiaries would have reported a loss of $1,123,665.34 on its 1978 consolidated income tax return regardless of how the price was allocated. Petitioner contends that any increase in the capital gain reported by Beaunit as a separate corporation due to the increased sale price of the

14. This is precisely the type of attack asserted by the defendants in this case on paragraph 3 of the settlement agreement. The defendants maintain that the shares of GNC stock held by Mr. Daum prior to the settlement of the lawsuit against GNC and Mr. Lucas contained a legend, which indicated that the shares were "Restricted." In this connection, Gary V. Shields, a broker employed by Dean Witter Reynolds, Inc. from October, 1985 through August 19, 1994 who attempted to sell Mr. Daum's stock in late 1987 or early 1988, testified that, as a result of this legend, Mr. Daum's shares of GNC stock were "absolutely unmarketable." (Defendants' Appendix, Exh. 1). Similarly, John J. Myers, Mr. Daum's attorney in the GNC litigation, testified that Mr. Daum's shares of GNC stock could not be sold at all or, if they could, the sale would be at a deep discount

of seventy-five percent below market price. (Defendants' Appendix, Exh. 2, pp. 24–26). The defendants assert that, because Mr. Daum's shares of GNC stock were worth far less than the then current trading price for unrestricted shares of GNC stock of $5⅜ per share, a large portion of the money received by Mr. Daum pursuant to paragraph 3 of the settlement agreement was for personal injury damages claimed in his lawsuit against GNC and Mr. Lucas. (Brief in Opposition, p. 4). If this was the case, however, it is difficult to perceive why such an allocation was not specifically made in paragraph 3 of the settlement agreement. This is especially so in light of the express allocation made to "personal injury losses" in paragraph 2 of the settlement agreement.

fixed assets would be exactly offset by the decrease in taxable income reported by Carter County Fibers as a separate corporation due to the decreased sale price of the inventory. Petitioner argues that because Beaunit would not have paid any taxes in 1978 regardless of how the purchase price was allocated, Beaunit and petitioner do not have adverse tax interests, and therefore the Commissioner could not be whipsawed.

Petitioner's argument misconstrues the importance of the whipsaw danger to the application of the *Danielson* rule. The *Danielson* rule does protect the Commissioner from the potential of being whipsawed, but this potential is not a prerequisite to the application of the rule. Petitioner's argument would require the court to determine the alternative tax consequences in each *Danielson* type case, a result that would violate the need for certainty inherent in the *Danielson* rule. In fact, the First Circuit has properly rejected a similar argument:

> The Commissioner properly points out that for parties to agree on paper one way, benefitting one of them vis-a-vis himself, and then to permit the other to claim that the agreement was really something different, exposes him to a whipsaw. This danger is one of the purposes of the "strong proof" rule.[15] Nor is that rule to be avoided in some individual case by showing, (as we understand taxpayer to contend here) that no whipsaw is involved. If certainty is a desirable goal, we would not consider this a desirable exception. Rather, it

could only lead to highly complicated debate. *Harvey Radio Lab., Inc. v. Commissioner,* 470 F.2d 118, 120 (1st Cir.1972) (footnote omitted).

\* \* \* \* \* \*

12 F.3d at 587–88.

In light of the Third Circuit's decision in *Sullivan* and the Sixth Circuit's decision in *North American Rayon,* and because the defendants have not alleged mistake, undue influence, fraud or duress in connection with the settlement agreement executed by Mr. Daum, GNC and Mr. Lucas, the court concludes that the *Danielson* rule applies in this case.[16]

Turning to the defendants' second argument that, even if the *Danielson* rule is applicable in this case, the government's motion for partial summary judgment should be denied because of its admission in parallel litigation in the United States Tax Court that a portion of the consideration received by Mr. Daum pursuant to paragraph 3 of the settlement agreement was for his agreement to terminate the lawsuit against GNC and Mr. Lucas, the government's alleged admission relates to paragraph 5(i) of the defendants' Tax Court petition in which the defendants alleged the following:

\* \* \* \* \* \*

i) As a part of the consideration for Daum's agreement to terminate his suit against GNC and Lucas, GNC agreed under the Settlement Agreement to purchase on or before September 25, 1988, 475,730 shares of its restricted and unregistered common stock owned by Daum and/or Linda M. Daum for the price of $5⅝ per share,

**15.** In *North American Rayon,* it was noted that the Sixth Circuit applied the "strong proof" rule, which requires a party seeking to disregard the express allocations in an agreement to adduce strong proof that the parties actually intended to attribute different values than those stated in the agreement, prior to its adoption of the *Danielson* rule. 12 F.3d at 588 n. 6.

**16.** The defendants have also asserted that the *Danielson* rule only applies when the taxpayer initiates a challenge to a tax assessment. Specifically, the defendants argue that their "research found no case in which *Danielson* was used offensively as a 'sword' by the party possessing the burden of proof." (Brief in Opposition, p.

17). After consideration, the court agrees with the government that neither the tax consequences of a transaction under examination nor the need for certainty inherent in the *Danielson* rule should be affected by the procedural posture of an individual case. As noted by the government, the defendants' argument would create an untenable loophole in the *Danielson* rule. Specifically, the *Danielson* rule would prevent a taxpayer who is denied a refund and files for a refund in district court from recovery, but would not apply if the government, based on the same facts, sued to recover an erroneously granted refund in the same court. (Reply Brief, p. 3).

the then current New York Stock Exchange price for unrestricted shares.

\*   \*   \*   \*   \*   \*

(Defendants' Appendix, Exh. 4).

In its answer to the petition, the government responded to this allegation as follows:

\*   \*   \*   \*   \*   \*

i). Admits, except denies for lack of sufficient information that the "then current New York Stock Exchange price for unrestricted shares" was $5⅝ per share.

\*   \*   \*   \*   \*   \*

(Defendants' Appendix, Exh. 5).

After consideration, the court agrees with the government that the defendants' reliance on this alleged admission of the Internal Revenue Service in the Tax Court litigation is misplaced. It is clear that the government does not dispute the fact that GNC agreed to purchase Mr. Daum's shares of GNC stock as part of the consideration for Mr. Daum's agreement to terminate his lawsuit against GNC and Mr. Lucas. Rather, the government is disputing the tax consequences of the settlement agreement as drafted by the parties to that lawsuit, and it is merely seeking to hold the defendants to Mr. Daum's agreement. (Reply Brief, p. 5). Accordingly, the court finds this argument unpersuasive.

Finally, as to the defendants' assertion that the government has not met its burden of proving that the refund paid to the defendants was "erroneous," the defendants argue as follows:

"The United States concedes that it bears the burden of proving that the refund paid to the Daums was erroneous. (citations omitted). However, the government's own attorney, Mr. Snyder, indicated in his letter dated October 19, 1995 that Ms. Goldsmith's determination that the Daums' claim for a refund should be allowed

was based solely on the representations made in the defendant's claim for refund, i.e. 'Taxpayer erroneously included personal injury proceeds of settlement award on Schedule D as sales proceeds received in connection with the redemption of 475,730 shares of defendant GNC's common stock.' "

(Brief in Opposition, p. 22).

In its reply brief, the government contends, and the court agrees, that Mr. Snyder's statement in his October 19, 1995 letter cannot be construed as an admission by the government that the proceeds at issue were, in fact, damages received by Mr. Daum on account of personal injury. Mr. Snyder merely states that the refund which the government now seeks to recover was based on the *defendants'* representation that they erroneously included personal injury proceeds in their taxable income for 1988. (Reply Brief, p. 4). Under the circumstances, the court finds no support in Mr. Snyder's letter for the defendants' argument that the government has failed to establish the erroneous nature of the refund issued to the defendants.[17]

In summary, the court concludes that, under the *Danielson* rule, the defendants are bound by the allocations set forth in paragraphs 2 and 3 of the settlement agreement between Mr. Daum, GNC and Mr. Lucas, and that the refund issued to the defendants by the Internal Revenue Service on May 3, 1993 was erroneous.

An order follows.

---

17. As to the defendants' argument that "the government has made no attempt to carry its burden of showing that its claim is equitable," (Brief in Opposition, p. 24) the court finds this argument unpersuasive in light of the government's treatment of GNC's attempt to gain a tax advantage by recharacterizing the nature of a portion of the proceeds paid to Mr. Daum to purchase his shares of GNC stock pursuant to paragraph 3 of the settlement agreement. If the government had treated the defendants and GNC in an inconsistent manner concerning paragraph 3 of the settlement agreement, the defendants' argument in this regard would be more appealing.